## UNIVERSAL CARLOADING & DISTRIB-UTING CO., Inc. v. RAILROAD RE-TIREMENT BOARD et al.

### No. 9649.

United States Court of Appeals
District of Columbia Circuit.

Argued April 15, 1948.

Decided Dec. 13, 1948.

Mr. Herbert J. Patrick, of Indianapolis, Ind., pro hac vice, by special leave of Court, with whom Mr. Harry C. Ames, of Washington, D.C., was on the brief, for appellant.

Mr. Myles F. Gibbons, General Counsel, Railroad Retirement Board, of Chicago, Ill., with whom Messrs. David B. Schreiber, Associate General Counsel, Railroad Retirement Board, and Alfred H. Myers, Railroad Retirement Board, both of Chicago, Ill., were on the brief, for appellee Railroad Retirement Board.

Mr. Clarence M. Mulholland of Toledo, Ohio, with whom Messrs. Willard H. McEwen of Toledo, Ohio, and Edward C. Kriz of Washington, D. C., were on the brief, for appellee Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees.

Before STEPHENS, Chief Judge, and WILBUR K. MILLER and PROCTOR, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

Universal Carloading and Distributing Company, engaged in the freight forwarding business, filed its petition in the United States District Court for the District of Columbia to review a decision of the Railroad Retirement Board which held the company to be an "employer" within the meaning of the Railroad Unemployment

Insurance Act.[1] It appeals from the court's judgment which sustained the Board's holding.

■ The case turns on the applicability to the appellant of the pertinent portion of the statute which, when skeletonized, defines an employer as

"* * * any company which is directly or indirectly owned or controlled by one or more such carriers * * * and which operates any equipment or facility or performs any service (except trucking service, casual service, and the casual operation of equipment or facilities) in connection with the transportation of * * * property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad * * *."

Consequently, if Universal is directly or indirectly controlled by the New York Central Railroad Company, as the Board found, and if it performs any of the functions enumerated in the Act, as the Board decided it does, the judgment appealed from must be affirmed. The two conditions which are requisite to coverage, being expressed in the conjunctive, must coexist in order for the Act to be applicable.

The second portion of the double question, which is whether Universal performs what for convenience may be called "railroad-like" functions, is easily answered. It is enough to quote from appellant's description of the business activities of Universal:

"* * * Its operations consist of providing transportation for less-than-carload (L.C.L.) and less-than-truckload (L.T.L.) freight shipments from a customer in any city or town to the ultimate consignee in any other city or town practically anywhere in the United States. The contract between it and the original consignor consists of a bill of lading similar to that issued by common carriers, covering the entire transportation so to be provided. * * * From the time Universal issues its bill of lading to the original consignor until the shipment is delivered to the ultimate consignee, Universal accepts full responsibility therefor, and is answerable for any loss or damage incurred.

\* \* \* \* \* \*

"In providing transportation, Universal uses the facilities of rail, motor vehicle or water carriers, or a combination thereof, in such manner as in its judgment will expedite the transportation in the shortest time and at the lowest cost to it. To do this, it maintains concentration and distribution or break-bulk stations and freight warehouses in the principal large cities of the United States. Where the original consignor lives in one of such cities, the freight shipment is picked up by a local drayman and delivered to its freight station. This drayage is known as 'local cartage.' Where the original consignor is in a smaller city or town in the territory served by Universal's station the freight shipment is transported as an L.T.L. shipment to Universal's freight station by a motor carrier. This is known as off-line transportation.

"Upon arrival at Universal freight station, the shipment is grouped with other shipments according to destination and class, and shipped as part of a full carload or truckload from that station to another of Universal's concentration, distribution or break-bulk stations in another city. \* \* \*

"The loading of the full carload or truckload at Universal's originating freight station is performed by Universal's own employees except in cases where the published tariffs of the railroad provide for loading by the railroad.

"Upon the arrival of the full carload or truckload at Universal's freight station in the city named as destination in the bill of lading, the car or truck is opened by Universal's employees and the various freight shipments comprising it are unloaded by Universal's employees. Shipments destined

---

[1] Act of June 25, 1938, c. 680, 52 Stat. 1094, et seq., as amended by Acts of June 20, 1939, c. 227, 53 Stat. 845 et seq., July 2, 1940, c. 530, 54 Stat. 741, August 13, 1940, c. 664, 54 Stat. 785, 786, October 10, 1940, c. 842, 54 Stat. 1094 et seq., April 8, 1942, c. 227, 56 Stat. 210, June 30, 1942, c. 463, 56 Stat. 465, and Act of July 31, 1946, c. 709, 60 Stat. 722 et seq., U.S.C.A., Title 45, §§ 351–367.

to ultimate consignees living in such city are then turned over by Universal to local draymen for delivery. Shipments destined to ultimate consignees living in the territory served by such city but beyond its metropolitan area, are turned over to motor carriers for transportation as L.T.L. to ultimate consignees. Shipments which are not destined to ultimate consignees in the city or territory served by such city are grouped and classified by Universal's employees and again are loaded as part of full carloads, or truckloads, to be transported by the rail or motor carrier to another Universal freight station in another large city under a new bill of lading again naming Universal as consignor and consignee, and, upon arrival, such carload or truckload is again opened and unloaded, grouped and distributed in the same manner." (References to Joint Appendix omitted.)

■ In our opinion, the foregoing demonstrates beyond doubt that Universal's activities fall within those described in the second section of the statute. Railroad Retirement Board v. Duquesne Warehouse Company, 1946, 326 U.S. 446, 66 S.St. 238, 90 L.Ed. 192. Being of that view, we turn to consider whether the Board properly found Universal to be under the control of New York Central.

The corporate history of the appellant is enlightening in this connection. Universal, organized in 1925, is wholly owned by United States Freight Company, the 300,-000 shares of the capital stock of the latter being listed on the New York Stock Exchange.

Late in 1928 the New York Central Railroad Company, hearing that the Pennsylvania Railroad Company was considering the acquisition of a substantial interest in Freight Company, decided to forestall that action by itself acquiring a controlling number of shares. In furtherance of that purpose it advanced, through a subsidiary, more than $13,000,000 to an apparently unrelated company, called L.C.L. Company, with which to purchase Freight Company shares in the open market. A contract between the New York Central subsidiary and L.C.L. defined the details of the arrangement. More than 50 per cent of the total shares of Freight Company were acquired with the funds advanced by New York Central, and thereafter were held by L.C.L.[2]

L.C.L. desired in 1932 to be relieved of its contract. Thereupon, looking toward that end, New York Central employed the Guaranty Trust Company of New York to organize the Linden Securities Corporation, which Guaranty Trust proceeded to do by having four of its employees own the capital stock of Linden Securities and act as its officers and directors. A new contract, replacing that originally made between New York Central and L.C.L., was entered into in 1932 by New York Central and Linden Securities. Under the terms of that agreement the latter became the record owner of the Freight Company shares formerly held by L.C.L., and in all other respects assumed obligations similar to those imposed upon L.C.L. by the prior contract.

In 1938 the Interstate Commerce Commission, after an extended hearing, decided that New York Central Railroad Company controlled Universal Carloading and Distributing Company, a situation not then permitted by law. Although New York Central denied having such control, it took steps to avoid the consequences of the Commission's criticism. Its general counsel prepared a trust indenture for execution by the railroad company and Linden Securities Corporation providing for the Freight Company shares held by Linden, and the evidences of debt executed by Linden to New York Central, to be placed in the hands of a trustee who would be empowered to vote the shares at stock-

---

[2] L. C. L. acquired 163,676 shares, or 54.6 per cent, of the 300,000 shares outstanding. After the transfer to Linden Securities Corporation, that company sold 15,200 shares in 1937, and thereafter held 148,476, or 49.56 per cent of the total number outstanding, which is the number later turned over to Meyer, trustee. Since the remaining shares were at all times widely distributed in the hands of the public, 49.56 per cent was, of course, enough to constitute effective control of Freight Company. In fact those shares were a majority of the total number voted at the several meetings of stockholders of which the record speaks.

holders' meetings of Freight Company without any instruction, dictation, suggestion or intervention by New York Central or Linden.

The general counsel approached one Meyer, who had then lately retired from a lengthy service as a member of the Interstate Commerce Commission, and asked him to serve as trustee. Meyer agreed to act and on June 15, 1939, the trust indenture and accompanying documents were executed. The New York Central official suggested to Meyer an annual compensation of $5,000, to which he agreed. From that time forward Meyer has had the passive duty of holding the Freight Company shares. He has received from Freight Company checks for dividends declared from time to time and has endorsed those checks to New York Central. He has received each quarter from New York Central its check for $1,250 as compensation for his services. He has annually executed a proxy with respect to the Freight Company shares and has forwarded it to the secretary of that company for use at stockholders' meetings.

While New York Central and Universal did not and do not concede that prior to June 15, 1939, the former controlled the latter, the appellant insists that the trust arrangement created as of that date divested New York Central of any actual control of Universal through its ownership of Freight Company shares and also took from it any power to control Universal.

The Board retorts that the trust indenture is revocable; that the power to control exists and can be exercised by revoking the trust indenture; that the New York Central's power to control, thus said to exist, brings Universal within the sweep of the statute as effectively as if it were admitted that actual control exists. Moreover, the Board asserts that despite the trust arrangement there is in fact actual control in the New York Central.

Appellant counters by saying the Board in reaching its decision "has entirely overlooked and ignored the fact that the busi-

nesses in question are transportation agencies subject to the regulation of the Interstate Commerce Commission, and that the Trust could not be revoked and Central could not acquire the stock of Freight Company except with the consent and approval of the Interstate Commerce Commission." Be that as it may, we have not overlooked the fact to which appellant refers, but we find it of no consequence. For, after the enactment on May 16, 1942, of the Freight Forwarder Act, 56 Stat. 293, 49 U.S.C.A. § 1011(g), which permits a railroad to control a freight forwarder, there was no longer any basis for the Interstate Commerce Commission's objection to New York Central's control of Universal which it discerned in 1938. Having therefore no further interest in the apparent separation of the two companies, the Commission would have no reason to disapprove a revocation of the trust.

The Supreme Court has said in antitrust cases that the history of an affiliation of corporations which is under attack as being illegal may be profitably examined in order to ascertain the intent and purpose which accompanied the formation of the affiliation.[3] We see no reason why it should not be equally profitable here to notice the intent and purpose which moved New York Central when it began its acquisition of Freight Company stock in 1929. Its avowed purpose was to obtain control of Universal for its own interest and in order to prevent the Pennsylvania Railroad from doing so, which it considered would be adverse to its interests. Yet it denies that it obtained control of Universal by the purchase of the Freight Company shares through the medium of L.C.L. Company, or that it had such control when Linden Securities succeeded L.C.L.

There is no mistaking the true nature of Linden Securities Corporation. It is not a creature of the Guaranty Trust Company and the four employees of that company who hold all of Linden's shares have no proprietary interest in them. New York Central paid to Guaranty Trust the sum

---

[3] United States v. Reading Co., 253 U. S. 26, 44, 40 S.Ct. 425, 64 L.Ed. 760; Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 46, 76, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann. Cas.1912D, 734.

which constituted Linden's original capital and surplus accounts. Linden Securities is, therefore, a mere instrumentality of New York Central. This being true, that railroad is in effect both the trustor and the beneficiary of the trust and can terminate it at will, and, since the freight forwarder legislation of 1942, the right to terminate has existed by the terms of the indenture. Not only so, but the trustee is plainly subject to the will of New York Central, receiving a substantial annual compensation from that railroad which may be stopped at any time by the termination of the trust. It is difficult to suppose he would not be responsive to the desires of his employer.

The appellant contends that no competent evidence was submitted to the Board tending to show that New York Central controlled Universal after the trust indenture was executed on June 15, 1939; that the only competent evidence was concerning control prior to that critical date; and that therefore the decision of the Board finding control of Universal in New York Central is entirely without substantial supporting evidence.

Those contentions may be quickly answered. The Board had before it ample evidence which convincingly showed Universal was actually controlled by New York Central prior to June 15, 1939. We think the Board and the court could properly infer the continuance after the critical date of the condition which obtained before, since the only change in circumstance was the creation of the trust, which is clearly revocable and which brought about no alteration whatever in Universal's prior management. It was properly presumed by the Board and the District Court, as an inference of fact, that Universal's officers continued to be controlled by the railroad company. In other words, through what may be thought of as a legal adaptation of the physical property of inertia by virtue of which matter persists in its state of rest or of uniform motion unless some force changes that state, New York Central's control of Universal continued after June 15, 1939, and still continues, unless something has interrupted or ended it. The trust arrangement did not have that effect,

and no other terminating cause is suggested.

Moreover, in our opinion, the power of New York Central to end the trust and thereafter itself to vote the Freight Company shares amounts in the circumstances not to just "power to control" but to actual control presently exercised. Control need not be affirmatively asserted in order to be effective and real. The conduct of Universal's affairs before the trust was formed was satisfactory to New York Central. This appears not only from the volume of business which the railroad company enjoyed from Universal, not only from the helpful cooperation which it received from Universal with respect to its own direct solicitation of business, but also from the fact that once Universal's management had been set up after L.C.L. Corporation's acquisition of the large block of Freight Company stock, that management was continued in office through the votes of Linden Securities at the stockholders' meetings of Freight Company. Argument is not necessary to demonstrate that an unsatisfactory management would have been removed.

The trustee has enabled that satisfactory management to continue. He professes that he has acted throughout his tenure solely in the best interests of Freight Company; but in reality he has not acted at all. He has never attended a stockholders' meeting. He has simply allowed the Freight Company management to perpetuate itself in office; his course in so doing may indeed have been to the best interest of the Freight Company, but that is not the question here. The trustee has voted to retain a management which was satisfactory to New York Central before his selection as trustee. Should he attend a Freight Company stockholders' meeting and attempt to supplant that management with another unsatisfactory to New York Central, he could be immediately removed by it. Thus the overshadowing authority of New York Central has actively preserved the status quo which pleased it. This is not a case of unexercised power of control. To the contrary, it is control itself.

As we have said, power to control need not be exercised in some affirmative, spectacular manner in order to amount to actu-

ality of control. The power may be so absolute, as it is here, that he who is the potential object of it is so dominated by it that he is actually under control. The trustee's passivity in this case, considered in the light of all the circumstances disclosed, is sure proof that he is consciously directed by New York Central. We are, therefore, not concerned with whether "control" in the statutory sense includes mere "power to control."

From what has been said, it follows that substantial and competent evidence supported the Board's decision that Universal is an employer as defined by the Act.

Affirmed.