**BROTHERHOOD OF RAILWAY AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES, Petitioner,**

v.

**RAILROAD RETIREMENT BOARD, Respondent.**

No. 13019.

United States Court of Appeals
District of Columbia Circuit.

Argued June 5, 1956.

Decided Oct. 18, 1956.

Mr. Lester P. Schoene, Washington, D. C., with whom Mr. Milton Kramer, Washington, D. C., was on the brief, for petitioner.

Mr. Myles F. Gibbons, Gen. Counsel, Mr. Edward E. Reilly, Asst. Gen. Counsel, Railroad Retirement Board, Chicago, Ill., for respondent.

Mr. Richard J. Flynn, Chicago, Ill., filed a brief on behalf of Bureau of Information, Eastern Railways, The Association of Western Railways, and Bureau of Information, Southeastern Railways, as amici curiae, urging affirmance.

Before DANAHER, BASTIAN and BURGER, Circuit Judges.

BURGER, Circuit Judge.

This case reaches us on a petition, filed under the Railroad Unemployment Insurance Act,[1] to review a decision of the Railroad Retirement Board denying unemployment insurance benefits to about 275 employees of the Railway Express Agency, employed at Pittsburgh, Pennsylvania. These employees were unemployed from September 24, 1953 to December 17, 1953, because of a labor dispute between their collective bargaining representative, the Brotherhood, and their employer, the Express Agency.

The record shows that on July 29, 1953 the Brotherhood wrote to the Agency giving it "formal notice * * * of our desire to upwardly adjust the existing rates of pay for all individual positions at the Pittsburgh, Pennsylvania operations * * * effective August 29, 1953." The Agency replied on August 3, 1953 that it would not participate in the requested conference because the bargaining agreement of March 2, 1951 between the Agency and employees precluded such action prior to October 1, 1953.[2] On August 5, 1953, the Brotherhood again requested the Agency to confer with it, but the Agency replied that the request was "contrary to the intent of the moratorium set forth in Article 3 of the * * * 1951 Agreement."

On August 20, 1953, the Brotherhood filed with the National Mediation Board an application for mediation of the dispute. In reply to an inquiry from the Secretary of the Mediation Board, the Agency reiterated its contention that the Brotherhood's request was barred by the Agreement of March 2, 1951. The Board advised both the Agency and the Brotherhood that the Board had no jurisdiction over the question of whether the Brotherhood's request was barred by the moratorium clause, but that the case

1. 52 Stat. 1099 (1938), 45 U.S.C.A. § 355(f).

2. Article 3 of the Agreement of March 2, 1951 between the Agency and the Brotherhood provided in pertinent part:
"After the date of this Agreement no proposals for changes in rates of pay will be initiated by either party hereto prior to October 1, 1953. * * *

Note: This Article III is not intended to prevent adjustments in the rates of individual positions."

The Agency contended the Note to Article 3 was intended only "to cover adjustment in rates of individual positions in those infrequent instances where the Rules have been improperly interpreted in rating such positions."

had been docketed and a mediator assigned to handle the dispute. Upon notification that a mediator would be in New York City on September 8 to mediate the dispute, the Vice President of the Agency replied that "there is no dispute to be mediated at this time" but he would "be available at [his] office September 8 to discuss the question of jurisdiction."

The Pittsburgh Local formed an "enlarged protective committee," consisting of 20 to 25 employees, which began to hold "continuous meetings" on September 15. At a special meeting of the Lodge on September 24 this committee advised the membership of its failure to secure an adjustment of the dispute and at 4:00 P.M. the employees ceased work (the Brotherhood contends the employees began a "continuous meeting" at this time).

On September 25 the Grand Vice President, who was conferring with the mediator in New York, sent a telegram to the General Chairman, in charge of the "continuous meeting" in Pittsburgh, stating he was "directing that all employees be returned to work immediately pending mediation and handling of our Pittsburgh wage adjustment demand * * * on its merits." The Local, alleging it interpreted the telegram as a request rather than an order, did not return to work.

The mediation was recessed on September 29 without agreement having been reached, and on October 8 the Board closed its file in the case.[3]

On October 16 representatives of the Local met with the Grand President who reported that the Agency refused to negotiate and it was deemed desirable to call localized strikes in Pittsburgh, Detroit and Milwaukee. He agreed to authorize a strike in Pittsburgh to become effective at 12:01 A.M., October 19, 1953, if, by then, two-thirds of the membership had voted to strike. Balloting took place on October 17 and 18 with more than two-thirds voting to strike. The Grand President was so notified on October 19 and he authorized the strike effective 12:01 A.M. October 19, 1953. Thereupon, the few employees who had continued work during the "continuous meeting" went out on strike.

The President of the United States created an emergency board on December 16, 1953, pursuant to § 10 of the Railway Labor Act, 44 Stat. 586 (1926), 45 U.S.C.A. § 160 and the strikes at Detroit, Pittsburgh and Milwaukee were terminated the next day.

The Pittsburgh employees filed claims for unemployment insurance benefits for varying periods from September 24 through December 17, 1953.[4] These claims were filed under the Railroad Unemployment Insurance Act,[5] which, unlike most such acts, awards benefits for unemployment due to participation in strikes, except when the strike was commenced in violation of the provisions of the Railway Labor Act or the established rules and practices of a bona fide labor organization of which the employee was a member. 52 Stat. 1098 (1938), 45 U.S.C.A. § 354.

The Unemployment Claims Review Section, Railroad Retirement Board, denied the claims for the entire period on

3. The chairman of the protective committee wired the Agency on October 2, 1953, requesting a conference to adjust local conditions, to which the Agency replied it would "be glad to meet with usual grievance committee * * * upon resumption of work by your membership." By letter of October 5, 1953, the Grand Vice President of the Brotherhood advised the Agency that "we are agreeable to changing the date of our desire for an upward adjustment in the rates of pay of all individual positions at the Pittsburgh, Pennsylvania operations * * * to become effective from August 29, 1953 to October 1, 1953." The Agency again replied that it would set a date for conference upon the return to work of the employees.

4. Unemployment insurance benefits were paid to the strikers at Detroit and Milwaukee.

5. 52 Stat. 1094 (1938), 45 U.S.C.A. § 351 et seq.

the ground that the unemployment after September 24 was due to a stoppage of work because of a strike commenced in violation of the rules of the Brotherhood[6] and the strike ballot and authorization on October 19 did not *cause* the work stoppage, since operations of the Agency were already completely shut down.

The employees appealed from this decision and a hearing was held before a referee who found there was a strike on September 24, 1953, and that it was commenced on that date in violation of the rules of the Brotherhood; unemployment benefits were, therefore, properly denied for the period from September 24 to October 19. However, noting that a strike vote authorized a strike on October 19, and relying on the fact that a number of employees testified that if the strike vote had been negative they would have ceased the unauthorized strike and returned to work, the referee ruled that *a new strike* commenced on October 19 and this strike, rather than the one beginning September 24, was the proximate cause of the work stoppage which followed. The work stoppage after October 19, unlike that beginning September 24, was held by the referee to have been commenced in accordance with the Brotherhood rules. The referee further concluded that the strike (which he had ruled began October 19) did not violate the Railway Labor Act, holding that the act restricts the right to strike only for a period *after* an emergency board has been created by the President.[7] The referee stated he believed that, in any event, the employees acted in accordance with the requirements of § 2, First of the Railway Labor Act,[8] since they did " 'exert every reasonable effort' to settle the wage dispute, but were precluded by the Agency's continued refusal to confer or negotiate over such dispute."

On review of the referee's decision the Railroad Retirement Board, with one member dissenting, reversed the referee as to the period beginning October 19. The Board ruled that the strike beginning on September 24 was commenced in violation of the Railway Labor Act[9] because the employees "disregarded completely the negotiating efforts, at the mediation stage, of the national officers of their Brotherhood and apparently were unconcerned about any of the requirements of the Railway Labor Act relating to the exertion of reasonable efforts to avoid interruptions of commerce or the operation of any carrier, particularly applicable while the mediation procedure prescribed by the Act was in progress. They commenced this strike to achieve their aims without regard for the requirements of the Railway Labor Act."[10] The Board agreed with the referee that the September 24 strike was begun in violation of the Brotherhood rules.

---

6. There was no strike ballot or authorization for the September 24 stoppage as required by the Brotherhood's Protective Laws.

7. § 10 of the Act, 44 Stat. 586 (1926), 45 U.S.C.A. § 160 provides:

   "§ 160. Emergency Board
   \*    \*    \*    \*    \*
   "After the creation of such board and for thirty days after such board has made its report to the President, no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose."

8. 44 Stat. 577 (1926), 45 U.S.C.A. § 152. This section provides:

   "First. It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."

9. Specifically, Section 2, First, supra note 8.

10. Thus the Board rejected the referee's interpretation that a strike violated the provisions of the Railway Labor Act only if it commenced after an emergency board had been created by the President.

However, the Board further held that the strike was continuous from September 24 to December 17 and the authorization of a strike by the Grand President, effective October 19, was not the *commencement of the strike* because it had already commenced on September 24. The record shows that there was no return to work October 18 or 19 (when the strike vote was taken) or at any time between September 24 and December 17. The Board noted that the employees could not have received the notice of October 19 from the Grand President at or before the time he authorized the strike beginning at 12:01 A.M. on that date, which indicates he recognized that the strike was in existence before he authorized it, and the Board stated that "As appellants did not cease their strike before 12:01 a. m., October 19, 1953, no strike may be considered to have been 'commenced' at that time." The Board concluded that the purpose of § 4(a–2)(iii), Unemployment Insurance Act, to prevent wildcat strikes would preclude a ruling that employees under the Act may grasp the advantages of a quick, unauthorized strike and yet, by thereafter going through the processes required for a strike, obtain unemployment benefits.

The Brotherhood seeks reversal here only of that part of the Board's decision which reversed the decision of the referee with respect to the period commencing October 19, 1953. Thus the only issue is whether the employees are entitled to unemployment benefits from October 19, the date the strike vote was taken. In rejecting the claim for this period the Board ruled that (1) a strike can violate the Railway Labor Act in ways other than commencement *after* the creation of an emergency board; (2) the strike was "commenced" in violation of the Railway Labor Act and the rules of the Brotherhood; and (3) the status of the strike, commenced on September 24 in violation of the Railway Labor Act and the rules of the Brotherhood and continued without interruption until December 17, was not altered by a strike vote taken on October 19 authorizing the Brotherhood to "commence" a strike.

If the record shows the commencement of the strike violated either the Railway Labor Act *or* the rules of the Brotherhood, the Board must be affirmed. To resolve the first question, i. e., whether the strike violated the Act, two factors control our inquiry. The first is the purpose of Congress in granting to employees of railroads, unlike industrial employees generally, unemployment benefits while on strike, and the second is the limit on the scope of appellate review of determinations of the Board.

The legislation dealing with the relations between railroads and their employees shows congressional concern with the vital need to avoid work stoppages in the nation's transportation system. Congress clearly contemplated that the contending parties should have time to evolve an amicable settlement while a railroad continues to operate; Congress recognizes the right to strike, "but postpones such action until the successive procedures set up by the act have been exhausted." [11] In the debate in the House and at the hearings the Railway Labor Act was described thus:

"There is one assurance that the American people will have, and that is that from the beginning of a dispute, all through the period of conciliation, all through the period of mediation, all through the period of arbitration, and for 60 days following the calling of the emergency board by the President of the United States, there will be no strike, there will be no interruption of traffic.

"Those who framed this bill are on record as stating that this is their interpretation of the language of the bill. 67 Cong.Rec. 4657 (1926).

"I can cover, I think, very briefly what the bill provides. It starts

11. Chicago River & Indiana R.R. Co. v. Brotherhood of Railroad Trainmen, 7 Cir., 1956, 229 F.2d 926, 931.

out by imposing a duty upon all carriers, upon their officers, agents, and employees to exert every reasonable effort to make and maintain agreements. That is in section 2, found on page 3. Now, there is the foundation of the entire legislation sought, and that is in agreement. It is made the duty of the parties to preserve peaceful, efficient relations by virtue of agreements so that the obligations of one to another may be thoroughly understood; and then to settle all disputes, whether arising out of obligations of such agreements or otherwise, in order to avoid any interruption of interstate commerce." *Hearings before House Committee on Interstate and Foreign Commerce,* 69th Cong., 1st Sess., p. 11 (1926).

The Supreme Court has described the plan of the Railway Labor Act for the handling of major disputes as follows:

"For their settlement the statutory scheme retains throughout the traditional voluntary processes of negotiation, mediation, voluntary arbitration, and conciliation. Every facility for bringing about agreement is provided and pressures for mobilizing public opinion are applied. The parties *are required* to submit to the successive procedures designed to induce agreement. § 5 First (b). But compulsions go only to insure that those procedures are exhausted before resort can be had to self-help. No authority is empowered to decide the dispute and no such power is intended, unless the parties themselves agree to arbitration." Elgin, Joliet & Eastern Railway Company v. Burley, 1945, 325 U.S. 711, 725, 65 S.Ct. 1282, 1291, 89 L.Ed. 1886.[12] (Italics supplied.)

It is conceded in the brief of the Brotherhood (p. 2) that in other industries employees unemployed due to participation in strikes are denied unemployment benefits.[13] At the hearings on the Railroad Unemployment Insurance Act opponents of the bill complained about this special treatment accorded to railway employees, one of them stating:

"This bill introduces a new and novel feature, in that an employee unemployed due to a strike not in violation of the Railway Labor Act or the established rules and practices of a bona fide labor organization of which he is a member, is entitled to benefits. Thus, the unemployment fund would become a strike benefit fund to a group directly responsible for the stoppage of work, causing their unemployment as well as that of related groups not directly involved in the strike. The provisions of this bill in reference to striking employees are contrary to the laws of the States. There are 45 States which have provisions unreservedly disqualifying striking employees from receiving benefits while on strike; in 3 others—Arizona, Montana, and Utah—this disqualification is subject to modification, dependent upon certains [sic] acts of omission or commission of the employer; and in only 3 States—New York, Pennsylvania, and Rhode Island—do the laws limit the period of disqualification." *Hearings Before a Subcommittee of the House of Representatives Committee on Interstate and Foreign Commerce,* 75th Cong., 3d Sess. 133 (1938).

Thus, Congress deemed continuous, uninterrupted operation of railroads so vital to the public interest that it offered to railroad workers this special dispensa-

12. See also Hearings before Senate Committee on Interstate Commerce, 69th Cong., 1st Sess., p. 16 (1926).

13. See Unemployment Compensation Commission of Alaska v. Aragon, 1946, 329 U.S. 143, 145, fn. 2, 67 S.Ct. 245, 246, 91

L.Ed. 136: "It is said that forty-three states and territories have provisions similar to those in the Alaska law disqualifying from unemployment benefits persons unemployed due to a labor dispute."

tion conditioned upon their compliance with procedural safeguards plainly designed to defer strikes to the last possible moment.

Once the Board shall have acted, in the light of the considerations which Congress deemed controlling, our review function is narrow indeed. The Railroad Unemployment Insurance Act [14] provides that "The findings of the Board as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive." Standing alone this is hardly a comprehensive guide but the courts have developed enlarged definitions of the scope of review. Thus, in Unemployment Compensation Commission of Alaska v. Aragon, 1946, 329 U.S. 143, 67 S. Ct. 245, the Supreme Court laid down broad general guides as to the scope of judicial review. There the statute denied unemployment benefits to employees if the unemployment was due to a labor dispute and the issue was whether there was a labor dispute in active progress on the controlling dates, within the meaning of the statute. The Commission denied benefits, holding that the unemployment was due to a labor dispute. The Court of Appeals, 9 Cir., 149 F.2d 447 reversed and the Supreme Court, reversing the Court of Appeals, said:

> "Here, as in National Labor Relations Board v. Hearst Publications, Inc., 1944, 322 U.S. 111, 131, 64 S. Ct. 851, 860, 861, 88 L.Ed. 1170, the question presented 'is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially.' To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings. The 'reviewing court's function is limited.' All that is needed to support the Commission's interpretation is that it has 'warrant in the record' and a 'reasonable basis in law.' National Labor Relations Board v. Hearst Publications, Inc., supra; Rochester Telephone Corp. v. United States, 1939, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147.

> "Applying these tests, we are unable to say that the Commission's construction was irrational or without support in the record." 329 U.S. at pages 153–154, 67 S.Ct. at page 250.[15]

██ We must agree with the Board's ruling that a strike can violate the Railway Labor Act although it was not commenced during the period after creation of an emergency board. The Railroad Unemployment Insurance Act does not define the phrase "strike * * * commenced in violation of the provisions of the Railway Labor Act" nor does the Railway Labor Act itself specify when a strike will or will not violate that Act. The Board must say in the first instance whether, within the meaning of the Railroad Unemployment Insurance Act, a strike violates the Railway Labor Act. The Board in reaching its conclusion no doubt had in mind the purposes of these two acts, and sought to give due weight to what Congress was seeking to accomplish. It seems clear that the Railway Labor Act was intended to encourage negotiation and conciliation and that the special dispensation in the Railroad Unemployment Insurance Act as to unemployment benefits was designed to encourage compliance with the "cooling off" procedures of the Railway Labor Act. Even though the Railway Labor Act does not specifically state that it is illegal to strike be-

---

14. Section 5(f), 52 Stat. 1099 (1938), 45 U.S.C.A. § 355(f).

15. See also Mahoney v. Railroad Retirement Board, 7 Cir.1952, 194 F.2d 752; Railroad Retirement Board v. Duquesne Warehouse Co., 1945, 80 U.S.App.D.C. 119, 149 F.2d 507, affirmed 1946, 326 U.S. 446, 66 S.Ct. 238, 90 L.Ed. 192; Universal Carloading & Distributing Co., Inc. v. Railroad Retirement Board, D.C. D.C.1947, 71 F.Supp. 369, affirmed 1948, 84 U.S.App.D.C. 188, 172 F.2d 22.

fore exhausting all attempts at negotiation, we cannot say the Board could not reasonably conclude that, *for the purposes of the Railroad Unemployment Insurance Act,* a strike violates the Railway Labor Act when it is commenced in disregard of the duties that Act lays upon both the railroads and the employees. The restrictive interpretation urged by the Brotherhood would mean that the railroad employees could strike without making any effort whatsoever to negotiate or in any way observe the "cooling off" provisions and procedures of the Railway Labor Act, and still collect unemployment benefits by securing a strike vote in an atmosphere of industrial hostility created by the employees' disregard of statutory procedures. We are not persuaded that Congress intended to give the employees the benefits of the special dispensation of one act and at the same time permit them to avoid the burdens of the other. The respective acts are interrelated and must be read together in the framework of the issues here presented.

■ The Board has also concluded that the action of the Local in commencing the strike on September 24 violated Section 2, First of the Railway Labor Act. When the Pittsburgh Local went on strike their national officers were still attempting to mediate and negotiate the dispute and the very next day the President of the Brotherhood directed the members of the Local to return to work. The striking employees did not comply with their President's order and the refusal to do so is a measure of how union discipline had broken down in the hostile atmosphere which developed. There is substantial basis in the record for the Board's conclusion that such action by the Local disregarded the requirements of the Act to exert reasonable efforts to avoid interruption of commerce.

■ Finally, we cannot say the Board's conclusion that the strike authorization of October 19 did not commence a new strike was an irrational or unwarranted application of this statute. To rule otherwise would mean that the Brotherhood could have the benefits of a surprise strike, which Congress intended to discourage, and then by going through the forms for commencing a strike, even though they never *ended* the first strike, receive unemployment benefits for an allegedly new strike. Here again the record demonstrates the Board could fairly have concluded that there was only *one* continuous strike which began September 24 in violation of the Railway Labor Act. Within our limited scope of review and considering the impact of a grant of benefits in the peculiar circumstances here shown and in the light of the clear legislative purpose, we cannot say that the Board's application of this statute was unwarranted, irrational or without "reasonable basis in law." Having so decided, it is unnecessary for us to reach the question whether or not the commencement of the strike also violated the rules of the Brotherhood itself.

The decision of the Board is therefore Affirmed.