BALTIMORE & OHIO RAILROAD COM-
PANY et al., Plaintiffs,

v.

UNITED RAILROAD WORKERS DIVI-
SION OF TRANSPORT WORKERS
UNION OF AMERICA, in its own right
and as representative of the United
Railroad Workers of America, CIO, Lo-
cal 1463 and its members, et al., Defend-
ants.

BALTIMORE & OHIO RAILROAD COM-
PANY, Bush Terminal Railroad Com-
pany, the Central Railroad Company
of New Jersey, et al., Plaintiffs,

v.

MARINE ENGINEERS' BENEFICIAL
ASSOCIATION, LOCAL NO. 33, AFL-
CIO, in its own right and as representa-
tive of its members, et al.

United States District Court
S. D. New York.
June 19, 1959.

Conboy, Hewitt, O'Brien & Boardman, New York City, Joseph P. Allen, Edward F. Butler, New York City, of counsel, for plaintiffs.

Delson, Levin & Gordon, New York City, Ernest Fleischman, New York City, of counsel, for defendant, Railroad Marine Union.

O'Donnell & Schwartz, New York City, John F. O'Donnell, New York City, of counsel, for defendant, Transport Workers Union of America.

Donovan, Leisure, Newton & Irvine, New York City, Carl E. Newton, Robert Morten, John Howley, New York City, of counsel, for defendants, Bernard Kearns, John J. Murray and James P. Ambrose, individually and as officers of Local M–108 United Marine Workers, Division of Dist. 50.

Herman N. Rabson, New York City, for defendant, Associated Maritime Workers, Local No. 1, Masters, Mates and Pilots.

Marvin Schwartz, New York City, Betty H. Olchin, New York City, of counsel, for defendant, International Organization, Masters, Mates and Pilots.

Lee Pressman, New York City, Ned Phillips, New York City, of counsel, for Marine Engineers' Beneficial Ass'n, Local No. 33.

William J. Hannan, New York City, for United Marine Division, Local 337, National Maritime Union, AFL-CIO and certain named individuals.

FREDERICK van PELT BRYAN, District Judge.

Plaintiff railroads are common carriers engaged in interstate commerce and coming into and serving the City and Port of New York. Defendants are alleged to be unions and officers of unions representing railroad employees in various crafts working on the fleets of tugboats operated by the respective railroads in and about New York harbor.

In action No. 147–119 plaintiffs sue for an injunction to restrain what is alleged to be an unlawful strike or work stoppage threatened against them on their harbor tugs in violation of the Railway Labor Act, 45 U.S.C.A. § 151 et seq., and for damages sustained as a result thereof.

This labor dispute stems from action taken by plaintiff railroads on June 10, 1959, when they posted notices advising that all positions as firemen, oiler or oiler-firemen on the tugs using diesel power would be abolished as of five days later at 12:01 a. m. on June 15, 1959. No other prior notice of this contemplated action had been given by the railroads either to unions or employees.

Defendant Local 1463 of the Transport Workers Union thereupon advised the plaintiff railroads that it had authorized a strike of tugboat and bridge forces to be called on June 15, 1959, at 12:01 a. m., when the abolition of these positions became effective, and that it was actively soliciting the support of other unions also to strike against the plaintiffs.

The plaintiff railroads thereupon commenced the present action and secured from this court an order to show cause why a temporary injunction against such strike or work stoppage should not be granted. The order contained a provision restraining a strike or work stoppage or the aiding, abetting or encouragement of such action pending the hearing and determination of the motion.

Upon the return day of the railroads' motion for a preliminary injunction the defendant unions brought on by order to show cause cross-motions for an order directing the railroads to restore the firemen-oilers who had been fired to their positions pending determination under the procedures authorized by the Railway Labor Act of the labor dispute which they claimed existed by reason of this controversy.

Prior to the hearing of the motion, and on June 15, 1959, the railroads, pursuant to their notice, had fired at least 125 oilers employed upon their diesel tugboats. The oilers so laid off began picketing piers and other places where the tugboats were tied up. As a result, employees in other crafts refused to cross the picket lines and all railroad traffic in the harbor by water ceased to move.

There was considerable controversy upon the argument of these motions as to whether the unions had withdrawn all strike authorizations and had instructed their members to work, or whether they were at least encouraging or aiding the work stoppage in violation of the temporary restraining order. However, this question is not now before me and I am concerned at this time only with whether a temporary injunction should be issued as the railroads ask and whether the railroads should be directed to restore the oilers to their positions pending appropriate action under the Railway Labor Act as the unions request. These are the only issues posed by the present motion and cross-motions.

Prior to the argument of the motion the railroads made an ex parte submission to the Railway Adjustment Board of what they apparently claimed to be the nub of the dispute. Their submission claims that "there are no restrictions under the existing agreements which prohibit the carriers from abolishing the position" of oiler on their diesel tugs. It proceeds upon the theory that since the applicable collective bargaining agree-

ments do not on their face prohibit or restrict the abolition of these jobs, the carriers have the common-law right to abolish these positions in the exercise of their managerial prerogatives.

The submission attempts to sustain the burden of showing that the oilers' positions are in fact unnecessary and recites facts which it is claimed sustain that burden.

It is apparent from reading the submission that it is the railroads' position that the question of whether or not the positions are unnecessary is one for determination by the Railway Adjustment Board, as is the question of whether or not they have the right to abolish these positions as a matter of managerial prerogative under the terms of the collective bargaining agreement, and under the provisions of the Railway Labor Act. These are some of the very questions which the railroads seek to have this court determine upon their application for a preliminary injunction.

The submission, moreover, cites many cases in which the Adjustment Boards have considered and determined similar or analogous claims as part of normal procedure under the Railway Labor Act.

On June 15, the day before these motions were returnable, the National Mediation Board requested representatives of the parties to meet with it "for discussion and investigation of the issues involved in this dispute". I understand that some such discussions have been had but that they have been suspended pending the determination of the motions by this court.

Plaintiffs maintain tugboats, lighters, carfloats, ferries, piers and docks in and about New York Harbor and in the Hudson and East Rivers. These marine operations are an important link in plaintiffs' transportation services both by way of interchange and otherwise. They handle through these marine facilities approximately forty-nine million tons of freight per year from which is derived an annual gross revenue of approximately one hundred eighteen million dollars. The "float" service operated by tugs handles an average of 1,547 cars of freight daily. This freight consists in large part of food, fuel, medicines and other commodities. Disruption of this service is causing hardship to the public as well as serious harm to the plaintiffs.

There are collective bargaining agreements now in force and effect between the various railroads and the various union defendants covering the classes of employees which the unions represent. These classes of employees include the firemen-oilers both on diesel and steam tugs, among the other marine crafts. It is unnecessary to go into the terms of the individual collective bargaining agreements since for purposes of this action it is stipulated that they are all of substantially the same pattern. These collective bargaining agreements are in the usual form and establish rates of pay, hours, rules and working conditions for the employees covered thereby.

While the facts before me are by no means complete, such essential facts as are necessary for the disposition of these motions are for all practical purposes agreed to or admitted. Neither side has asked for a hearing on the facts. The questions for decision arise under the admittedly applicable provisions of the Railway Labor Act, 45 U.S.C.A. § 151 et seq.

The railroads have made a transition from steam to diesel tugs over a number of years. On steam tugs there had always been at least two men in the engineroom, the engineer, and a fireman whose principal job was to stoke the fires. The practice of having two men in the engineroom continued as diesel tugs were substituted for the older steam tugs and the second man on the diesel was denominated as an oiler or fireman-oiler. On the diesel tugs the stoking was no longer necessary, and, indeed, the railroads claim that the oiler is for all practical purposes a supernumerary. At the present time the majority of the tugs operated by the railroads are diesel powered and the position of the second man in the engineroom filled by the oilers has been maintained on diesel tugs for many years. All diesel

tugs now operated were in operation at the time of the execution of the last collective bargaining agreements between the railroads and the unions covering tugboat workers and among the crafts specifically listed in the agreements which are now in force, and have been in force for several years, are oilers and firemen on tugboats.

Plaintiff railroads assert that the change from steam to diesel power has made the position of oiler on the diesel tugs wholly unnecessary. They claim that whereas the firemen on steam tugs perform a necessary function, the only job performed by the oilers on the diesel tugs now consists of keeping the engine-room brass and bilges clean. This is the basis claimed for the abolition of these positions.

The railroads contend that as a management prerogative they have the right in their uncontrolled discretion to abolish unnecessary jobs in the absence of express contractual provisions to the contrary. They claim that since the collective bargaining agreements with the unions contain no express prohibition against abolition of the oilers' jobs they have the absolute right to abolish them, and that this is no concern of the union and does not give rise to a "labor" dispute within the meaning of the Railway Labor Act. They assert that the oilers whose jobs are abolished may, and no doubt have, seniority rights which may enable them to bid in on the relatively few steam tug jobs which remain, and also are entitled to rights under the Railway Retirement Act, 45 U.S.C.A. § 228a et seq. They say that the only labor dispute which may arise out of the abolition of these jobs is that relating to the enforcement of the seniority and other rights which the fired or otherwise displaced employees enjoy, and cannot relate in any way to the abolition of positions by management prerogative.

The unions, on the other hand, maintain that the oilers' jobs are protected by the collective bargaining agreements, that the abolition of their positions on the diesel tugs is a lockout by the railroads and is a unilateral modification of the outstanding collective bargaining contracts by the railroads, and that the railroads have not followed the mandatory processes required by the Railway Labor Act for modifying or changing the contractual arrangements presently in effect. They point to the fact that the diesel tugs were being operated at the time the present collective bargaining agreements were negotiated, that the diesel oilers are specifically covered in such agreements as to rates of pay, hours and working conditions, and that the agreements expressly forbid the discontinuance or abolition of existing positions and the creation of other positions under other titles to do the same type of work. The unions claim that the oilers still do useful work on the diesel tugs and that the abolition of their positions would of necessity result in the transfer of their duties and functions to new or different positions in substantial modification of the existing agreements.

The questions presented for decision here are whether, pending completion of the procedures prescribed by the Railway Labor Act, (1) the railroads are entitled to a preliminary injunction restraining a strike or work stoppage by the unions, and (2) whether the unions are entitled to a decree directing the plaintiffs to restore the status quo by returning the oilers who have been laid off to their positions. The determination of these questions depends on the interpretation and application of the Railway Labor Act which I have recently had occasion to consider extensively in American Airlines, Inc. v. Air Line Pilots Ass'n, D.C., 169 F.Supp. 777. It is unnecessary to repeat the analysis of the various provisions of the Act which I made there.

However, a brief discussion of the mechanics of the Act as it is applied in the settlement of labor disputes will be helpful.

Such disputes are either "minor" or "major". This terminology is not used in the Act but arises from the definitions contained in Section 3, First, (i), Section 2, Sixth and Seventh, and Section 6.

Thus, what are termed "minor" disputes arise out of the interpretation or application of existing collective bargaining agreements and grievances arising therefrom. A major dispute, on the other hand, is one that arises from an intended "change in agreements affecting rates of pay, rules, or working conditions". See Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886.

This distinction is of importance here where the railroads assert that whatever dispute presently exists is minor and the unions insist that it is major. Its importance lies in the different legal consequences which flow from the two different kinds of disputes.

█ Both must be first negotiated between the parties.[1] If such negotiations are unsuccessful the process for the settlement of major and minor disputes diverges widely. A minor dispute may be referred by either or both parties to the Railway Adjustment Board or to the appropriate system Adjustment Board designated by the collective bargaining agreement. The Adjustment Board determines the dispute and its decision is final. In the case of a minor dispute a strike during the pendency of the matter before the Adjustment Board is illegal and may be enjoined. There is no right to strike or to use any economic self-help or pressure even after the award has been made and the parties are bound to comply with it. Brotherhood of R. R. Trainmen v. Chicago River & Indiana R. R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622.

If, on the other hand, the dispute is major a different procedure is followed after the preliminary negotiations have failed. There is no compulsion on the parties to agree at any stage of the procedure. However, duties are specifically imposed on both carrier and union to attempt the settlement of major disputes by mediation under the aegis of the National Mediation Board. Mediation failing, the Board may recommend arbitration. If the parties accept arbitration they are bound by the award of the arbitrators. If they refuse to accept arbitration a Presidential Emergency Board may be convoked under appropriate circumstances which makes a report and recommendations on the dispute.

There are three "freeze" or "cooling-off" periods covering the entire course of the proceedings required to be followed under the Act, and the parties are required to maintain the status quo with respect to the matters in controversy until thirty days after the processes of the Act have been exhausted.

█ While the parties are free to resort to the recognized types of economic coercion or pressure after the exhaustion of the processes of the Act, neither strike nor lockout nor any other change in the status quo may be resorted to until such exhaustion has taken place, and any such action may be restrained by injunction. American Airlines, Inc. v. Air Line Pilots Ass'n, supra, and cases there cited.

Moreover, a further mechanism is provided by the Act to aid in the settlement of any dispute whether it be major or minor. If a dispute reaches such proportions that, in the view of the National Mediation Board, a "labor emergency" exists, the Board may proffer its services under Section 5, First (b) of the Act. In this situation the Board in its discretion may treat the controversy as a major dispute and mediate on that basis. If this occurs the various "freeze" provisions of the Act applicable in the case of major disputes come into play and neither of the parties may change the status quo "in effect prior to the time when the dispute arose".

---

1. It may be noted at this point that the railroads do not allege that they made any attempt whatsoever to negotiate with the unions or even to discuss the proposed abolition before they published the five-day notices of abolition. The unions maintain, and it is not challenged, that they were not even notified of the proposed abolition before the notices were published. The railroads, on the other hand, imply that they would have been willing to discuss the matter with the unions had not the unions immediately issued strike calls.

It also seems plain that the Mediation Board may attempt to resolve the dispute even if in its view it is minor. If such efforts to resolve a minor dispute fail the Mediation Board may remit the parties to the appropriate Adjustment Board for determination. See Brotherhood of R. R. Trainmen v. Chicago River & Indiana R. R. Co., supra.

■ The policy of the Act is to avoid economic strife and disruption in the vital transportation industry. In some areas of strife (where the disputes are minor) the parties are precluded from waging private economic warfare to the detriment of the public. These disputes are referred to final and binding compulsory arbitration. The freedom of either party to resort to economic self-help is subordinated to the public interest in maintaining a functioning and uninterrupted transportation system. Elgin, J. & E. Ry. Co. v. Burley, supra.

In major disputes involving issues which are of vital importance to the parties, while the Act does not proscribe the use of ultimate economic coercion, the public interest is protected until the procedures of the Railway Labor Act have been fully exhausted. The "freeze" provisions which the Act contains serve both as a "cooling-off" period and as a period in which public opinion can be crystallized as a means of pressure upon the parties to reach agreement without strike or lockout and the consequent disruption of commerce.

At least in the case of major disputes it is plain that it is the purpose of the Act to maintain the status quo ante throughout.

The present controversy is plainly one which falls within the statutory scheme of the Railway Labor Act and is to be determined pursuant to its provisions. What is the posture of this controversy in terms of the Railway Labor Act procedures?

The Railroads, proceeding on the premise that this is a minor dispute, have made their ex parte submission to the Railway Adjustment Board. Implicit in this submission is the concession that even the question of whether they have the right to abolish these positions in the exercise of uncontrolled managerial prerogative is a matter for determination by that Board.

The basis of the railroads' contention that this is a minor dispute is not entirely clear. As far as I am able to ascertain, their position may be summarized as follows:

There is no express prohibition in the collective bargaining agreements against abolition of the oilers' positions or, indeed, against the abolition of any positions deemed by management to be unnecessary. Such abolition is a matter of management prerogative which lies in the uncontrolled discretion of the railroads. Therefore the matter is one in which the unions have no voice and does not constitute a labor dispute at all. Since the unions maintain that the oiler positions are protected by the collective bargaining agreement, the only dispute there can be concerns the interpretation and application of these existing contracts and is therefore a minor dispute only.

The unions, on the other hand, maintain that the abolition of these positions which are expressly covered as to wages, hours and working conditions by the collective bargaining agreements, constitutes an attempted unilateral change or modification of the agreements which cannot be accomplished without following the procedures, including notice of intended change, provided by Section 6 of the Act. The dispute is therefore necessarily a major one.

Moreover, the unions contend that if the oilers do any work at all (and it is claimed that they do considerable) the abolition of their positions will necessarily mean the reassignment of such work to other crafts or classes of employees, which is forbidden by the collective bargaining agreement and necessarily involves a change in the terms of such agreements within the meaning of Section 6. See O'Donnell v. Pan American World Airways, Inc., 2 Cir., 200 F.2d

929; Butte, A. & P. Ry. Co. v. Brotherhood of Locomotive Firemen and Enginemen, D.C.D.Mont., 168 F.Supp. 911, affirmed 9 Cir., 268 F.2d 54.[2]

At this point, however, the National Mediation Board is making its own investigation. No doubt in the course of that investigation and the discussions had with the parties, attempts will be made to adjust the controversy.

If those attempts fail the Mediation Board may either withdraw from the matter or determine that a labor emergency exists and thus invoke the processes of the Act applicable to major disputes. If the Board withdraws then the Adjustment Board must act on the submission of the railroads and any countersubmissions made by the unions.

■ Of course, the unions may question the jurisdiction of the Adjustment Board over the dispute submitted by the railroads upon the ground that it is a major rather than a minor dispute as the Board may also do on its own motion. The Boards will have to determine their own jurisdiction, and in making that determination decide whether the dispute is major, as the unions claim, or minor, as the railroads claim. The Boards clearly have the power to make such a determination. See Garrison, The National Railroad Adjustment Board, 46 Yale L.J. 568.

If the Adjustment Board should take jurisdiction then either (a) it may find in favor of the railroads on the merits and the railroads would be free to abolish the positions, or (b) it may determine the questions submitted against the railroads on the merits, in which event the railroads would, of course, be obligated to retain these persons in their positions, or (c) it may direct the parties to take such other action or impose such conditions as it deems appropriate under the circumstances.

If the Adjustment Board declines jurisdiction upon the ground that the dispute

is major, then the parties are relegated to their remedies under Section 6 for the settlement of major disputes and are bound to maintain the status quo ante pending the exhaustion of such procedures.

■ There is no question that the appropriate agencies under the Railway Labor Act have the power to decide which of these contentions, and any related contentions of the parties, are correct. This is true even as to the railroads' claim that there is no labor dispute at all on the theory that abolition may be made as a matter of managerial prerogative. Norfolk & P. B. L. R. Co. v. Brotherhood of Railroad Trainmen, 4 Cir., 248 F.2d 34, certiorari denied 355 U.S. 914, 78 S.Ct. 343, 2 L.Ed.2d 274. Cf. Brotherhood of Railway & Steamship Clerks, etc. v. Railroad Retirement Board, 99 U.S.App.D.C. 217, 239 F.2d 37.

■ Not only have the Railway Labor Act agencies the power to decide such questions but they are the appropriate agencies to decide them. The Railway Labor Act contemplates that such questions shall in the first instance be decided within its framework rather than by the courts. These agencies have the competence and expertise in this field which qualify them to make such determinations and makes it particularly fitting that they should make them.

I do not propose to usurp their functions here and to substitute the courts for the processes of the Railway Labor Act provided for this purpose by the Congress, until these qualified administrative agencies have acted. Only then, if appropriate, may the courts intervene by way of such review as may be authorized or appropriate.

Therefore I will not undertake to decide these questions here but will remit the parties to the processes of the Railway Labor Act for their determination. My only concern at this stage is to vindicate the policies and procedures of the

---

2. It may be noted that one of the unions asserts that it represents oilers only and that the action of the railroads totally abolishes the class of employees which it represents.

Railway Labor Act and to permit them to be carried out effectively. One thing is plain, however. Until it is determined whether this is a major or minor dispute it is essential that the status quo ante be maintained. Moreover, the maintenance of the status quo ante here is of paramount importance because the disturbance of the status quo by the firing of the oilers is plainly the cause of whatever work stoppage presently exists.

■ Ordinarily, whether the dispute be major or minor, the unions are precluded from striking while the procedures of the Railway Labor Act are being followed. Here, the unions assert that the railroads are precluded from enjoining the strike by the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., because they failed to engage in preliminary negotiations with the unions as they were required to do before formal submission to the agencies which the Act provides. It is unnecessary to determine whether this contention of the unions is correct, or whether, as the railroads claim, the precipitate action of the unions in calling a strike relieved them from the necessity of entering into the negotiations with the unions which they claim they were willing to undertake had a strike call not been issued.

For the basic practical question here is whether, as the unions claim, the railroads should be required to restore these oilers to the positions which have been abolished during the pendency of the Railway Labor Act proceedings. This is the key to the whole question of work stoppage, whether by way of strike, as the railroads claim, or by way of refusal of employees to cross concededly legal picket lines, as the unions maintain.

It seems clear to me that the railroads are not entitled to the injunctive relief which they seek unless and until they restore the oilers to these positions. The firing of these oilers, whose positions are covered by the collective bargaining agreements, and many of whom have held these positions without protest by the railroads for many years, in the absence of any precipitating technological change or circumstance, does not seem to me to be in accordance with the theory or spirit of the Railway Labor Act.

This is emphasized by the controversy as to whether this is a major or minor dispute, a question which remains to be determined during the course of the procedures under the Railway Labor Act, which I have outlined above.

Moreover, the claim of the railroads that the exercise of managerial prerogative does not involve a labor dispute which comes under the Railway Labor Act at all is belied by its own ex parte submission of that very question to the Adjustment Board under the Railway Labor Act.

■ The policy of the Railway Labor Act for the avoidance of economic warfare in the transportation industry in the public interest, the equities of the present situation, and the necessity of maintaining the status quo ante at least until the question of whether this is a major or minor dispute is administratively determined, all impel the conclusion that the railroads should be directed to restore these oilers to their positions at this time. Indeed, until the processes compelled by the Act are followed, any change in the status quo ante violates the express purpose of the Act to "avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof". Section 2, First. See Howard v. Thompson, D.C.E.D.Mo., 72 F.Supp. 695, 703, affirmed in part, reversed on other grounds sub nom. Howard v. St. Louis-San Francisco Ry. Co., 8 Cir., 191 F.2d 442, affirmed sub nom. Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283.

I will therefore grant the cross-motions of the unions to the extent of directing that the railroads restore the oilers to the positions on the diesel tugs which have been abolished pending the completion of appropriate processes under the Railway

Labor Act. Such restoration shall take place not later than midnight of Saturday, June 20, 1959.

There remains the prayer of the railroads for injunctive relief against strike or work stoppage pending the completion of Railway Labor Act procedures. In all probability the restoration of the oilers to their positions at this time, as I am directing, will eliminate the causes of the current work stoppage and full tugboat service will resume. However, the situation is disturbed at present and service is now interrupted to the great disadvantage of both the public and the railroads. It is essential that the status quo ante be maintained while the Railway Labor Act procedures are being followed.

Under these circumstances a preliminary injunction should issue continuing in force the provisions of the temporary restraining order previously made in this case.

Since the reinstatement of the oilers will restore the status quo ante it is unnecessary to consider further the contention of the unions that the railroads are barred from injunctive relief under the Norris-LaGuardia Act because of their alleged failure to follow procedures required by law. If negotiation is required as a prerequisite to submission to the Adjustment Boards, that is a matter for the Boards to determine in the course of the Railway Labor Act procedures.

These injunctive directions will serve to vindicate the processes of the Railway Labor Act and harmonize its provisions with those of the Norris-LaGuardia Act in the manner approved by the Supreme Court in the Chicago River case.

Proposed orders carrying out the decisions made in this opinion will be exchanged by the parties and submitted to me at my chambers at 11:30 a. m. Saturday, June 20, 1959.

■ One further matter remains for decision. The railroads have also brought a separate action (No. 147–164) against unions not named as defendants in their original suit which represent the engineers, masters and other marine crafts on the tugboats. This action is to restrain a strike or work stoppage by them alleged to be threatened or actually in effect. A motion for a preliminary injunction similar to that sought in the original action has been made by the railroads. After hearing several of the defendant unions I declined to issue a temporary restraining order since I was not persuaded that these unions had taken strike action or were aiding or encouraging a work stoppage by their members in any way.

After hearing argument and considering the affidavits submitted in support of and in opposition to the motion I have concluded that a temporary injunction should not be issued in the second action. The unions named as defendants do not represent any of the oiler-firemen but only other crafts. It has not been established that these unions have authorized a strike, threatened one or encouraged or aided or abetted, or approved, the work stoppage which occurred. Indeed, such evidence as there is is to the contrary.

The railroads concede that the oilers who have been fired have the right to call their plight to the attention of the public by picketing. The unions claim that they cannot compel their individual members to cross such picket lines as the oilers have established, and it is doubtful if they can do so. Moreover, there is some indication that members of the defendant unions have tried to continue work on the tugboats but have been prevented from so doing because the tugs were laid up.

In any event, in view of the determination I have made in the first action any immediate cause of strike has been removed and there seems no reason to suppose that the work stoppage now in effect will continue. Under these circumstances I deny the railroads' request for a preliminary injunction against the defendant unions in the second action without prejudice to a renewal should later circumstances so dictate.

It is so ordered.