## In The Matter of HUDSON & MANHATTAN RAILROAD COMPANY, Debtor.

United States District Court
S. D. New York.
April 14, 1959.

McGoldrick, Dannett, Horowitz & Golub, New York City, for trustee of the debtor, Emanuel Dannett, William W. Golub, Wilfred Feinberg, Herbert D. Schwartzman, New York City, of counsel.

Zelenko & Elkind, New York City, for respondents, Arnold B. Elkind, New York City, of counsel.

DAWSON, District Judge.

This is a proceeding brought on by an order to show cause wherein petitioner, Hudson & Manhattan Railroad Company (hereinafter called "the Carrier"), seeks a temporary injunction restraining the respondents, the Brotherhood of Railroad Trainmen (hereinafter called "the Brotherhood"), and various committees, officers and representatives of the Brotherhood, from any strike, work stoppage, slowdown or picketing of the railroad operated by the Carrier.

A hearing was held and the Court finds the following facts:

Petitioner, which operates an electric passenger railroad in interstate commerce between Newark, New Jersey and New York City, which is one of the important commuter transportation systems in the Greater New York area, is now in reorganization pursuant to Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq. Herman T. Stitchman is the Trustee of the Carrier, which is the debtor in such proceedings.

One of the routes of the Carrier is between Newark, New Jersey and New York City, which it operates under a joint service arrangement with the Pennsylvania Railroad Company. In the latter part of 1956, petitioner and the Pennsylvania Railroad Company entered into an arrangement by which they would, between them, purchase 50 new cars for use on said route. Petitioner bought and paid for 20 of such cars at a total price

of $1,675,000. One of the considerations prompting the purchase of the cars by this bankrupt Carrier was the expected saving of labor costs as a result of having modern equipment.

The old cars previously used by the Carrier did not have multiple door controls and as a result it was necessary to have one trainman between each two cars to open and close the doors. The new cars which have been acquired have multiple door controls, thus enabling one trainman to open and close the doors of an entire train. This feature, in the opinion of the Carrier, would enable it to operate the route with 17 less trainmen. The trainmen also collect tickets between the station stop at Journal Square and the one in Newark. The Carrier believed that if a consolidated job of flagman and ticket collector were established on this route, this together with the multiple door controls, would enable it to operate its trains with a total of 38 less trainmen than had been used in the old cars.

For a period of about a year representatives of the Carrier and the respondent Brotherhood carried on negotiations with reference to a possible revision of the agreement between them which might be necessary in order to permit these savings to be put into effect. Having been unable to work out an agreement, petitioner, on April 4, 1958, gave notice to the Brotherhood of a proposed change in the basic agreement which would enable petitioner to combine the jobs of flagman and ticket collector. On April 11, 1958, the Brotherhood presented a series of counter-proposals of changes desired by them in the basic agreement.

Various conferences were held, but no agreement was reached. In October, 1958, the proposals of the Carrier and the counter-proposals of the Brotherhood were submitted to the National Mediation Board under the provisions of § 5 of the Railway Labor Act, 45 U.S.C.A. § 155. Conferences were held with a Mediator appointed by that Board. On February 24, 1959, the National Mediation Board advised the parties that it had been unable to get the parties to reach an agreement and suggested that the parties enter into an agreement to submit the controversy to arbitration under the auspices of the National Mediation Board. The Brotherhood accepted this proposal. The Carrier took the position that it had the right to eliminate unnecessary trainmen jobs under the existing agreement. It decided to drop the proposal to amend the basic agreement to provide for a joint flagman-ticket collector job, thus leaving only an issue as to interpretation of the existing agreement with reference to the elimination of trainmen due to a revision of runs and the multiple control cars. This involved the elimination of 17 jobs, rather than the 38 jobs which would have been involved if the proposed changes in the agreement had been effected.

On March 2, 1959 the Carrier advised the National Mediation Board that it was its position that it could take action to eliminate unnecessary jobs under the existing contract without serving notice under § 6 of the Railroad Labor Act and that therefore there was nothing to be arbitrated before the National Mediation Board.

The Carrier thereupon proceeded with its plans for revised work schedules and called upon representatives of the Brotherhood, in accordance with the basic agreement, to make a "pick" of men for the new schedules. The Brotherhood's representatives refused to make these selections and therefore the Carrier proceeded to put the new assignments into effect on March 20, 1959. The Brotherhood continued to object and on March 27, 1959 petitioner submitted to the National Railroad Adjustment Board the then pending dispute, seeking an award declaring that the work schedules promulgated by it were in accordance with the existing agreement and that the refusal by the Brotherhood to make its selections constituted a violation of the agreement.

The National Railroad Adjustment Board accepted the controversy and on

March 31, 1959, advised the Brotherhood that an answer should be filed by April 30, 1959. Up to the time of the hearing no answer had been filed by the Brotherhood. The revised work schedules of the Carrier went into effect on April 5, 1959, resulting in the elimination of certain jobs.

On March 26, 1959, petitioner received a copy of a letter bearing date of March 24, 1959, in which the Brotherhood advised the National Mediation Board that the National President of the Brotherhood had authorized a strike on the Carrier's lines to begin at 11:00 p.m. on April 4, 1959. Thereupon application was made for the instant order to show cause and due to the temporary restraining order contained therein no strike has yet taken place.

The situation on the date of the hearing was, therefore, as follows:

Petitioner put its revised work schedules into effect resulting in the elimination of 17 jobs, contending that it had a right to do so under the existing agreement. Petitioner had dropped its proposal to amend the agreement to provide for a joint flagman and ticket collector, which if adopted would have resulted in the elimination of 21 additional jobs. Since the Brotherhood contested the Carrier's interpretation of the agreement the dispute was submitted to the National Railroad Adjustment Board, accepted by it and is now before it. Under the circumstances has this Court the power to enjoin the threatened strike while the matter is before the National Railroad Adjustment Board?

■ The law on the subject seems clear. The United States Supreme Court has held in Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. Co., 1957, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622, rehearing denied, 353 U.S. 948, 77 S.Ct. 823, 1 L.Ed.2d 857, that a District Court may, under the Railway Labor Act bar strikes concerning matters pending before the National Railroad Adjustment Board, and that such strikes are enjoinable, notwithstanding the provisions of the Norris-LaGuardia Act, 29 U.S.C.A. §§ 101–115.

■ Respondents in this proceeding recognize the power of the Court to enjoin a strike, as expressed in the Chicago River case, but they maintain that the jurisdiction of the Railroad Adjustment Board extends only to "minor" disputes and that the controversy having once been before the National Mediation Board, and the Carrier having refused to arbitrate before that Board, it is now estopped from placing the controversy before the Railroad Adjustment Board and seeking injunctive remedy from this Court. Respondents rely upon the case of Brotherhood of Railroad Trainmen v. Toledo, Peoria & Western R. R., 1944, 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534.

This raises the question as to what was before the Mediation Board and what is now before the Adjustment Board. The facts clearly show that the issues submitted to the Mediation Board were the Carrier's desire at that time to amend the basic agreement (which would have allowed a combination job of flagman and ticket collector and which would have resulted in the elimination of 38 jobs) and the Brotherhood's counterproposals for other changes in the basic agreement. The Carrier's proposal to change the basic agreement has now been dropped. It contends that in taking the action which it recently did to promulgate the new work schedules it was taking action which is authorized by the present agreement. The Brotherhood disputes the authority of the Carrier to take this action under the present agreement. Whether the Carrier is correct in its interpretation of the agreement is not before the Court. There is a dispute between the parties relating to an interpretation of the agreement and this is the only dispute which was submitted to the Railroad Adjustment Board.

· [3] The proposals which have been put before the Mediation Board were "major" disputes, as defined by the Su-

preme Court in the Chicago River case.[*] They were "major" disputes because they involved changes in the agreement between the parties. Such "major" disputes properly go to the Mediation Board. But, as the Supreme Court has pointed out, disputes involving an interpretation of an existing agreement are denominated as "minor" disputes and are properly determinable by the Adjustment Board. When the Carrier decided to drop the proposal to amend the present agreement, there remained merely the question as to whether it had the power, under the present agreement, to alter work schedules and eliminate 17 jobs, which under the altered schedules would have been unnecessary. If it had no power to eliminate the jobs then the award of the Railroad Adjustment Board will protect the rights of the employees. The award of the Board, in the case submitted to it, would be binding on all parties. This procedure before the Adjustment Board is, as the Supreme Court has indicated, a form of compulsory arbitration; [**] it cannot be circumvented by a strike.

The Court concludes:

(1) That the Carrier has submitted to the Railroad Adjustment Board a dispute as to whether the Carrier has power under the present agreement to promulgate new work schedules and in connection therewith eliminate unnecessary jobs.

(2) That the issues submitted to the Adjustment Board are properly within the jurisdiction of that Board.

(3) That the Brotherhood of Railroad Trainmen has threatened a strike.

(4) That a strike would disrupt interstate commerce, interfere with the orderly reorganization of the Carrier in the proceedings now pending in this Court, and would tend to render futile the proceedings now pending before the Railroad Adjustment Board.

(5) That a temporary injunction should issue, as prayed for in the peti-

tion, such injunction to be binding so long as the dispute is pending before the Railroad Adjustment Board.

Submit decree in accordance with opinion.

[*] 1957, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622.

[**] 353 U.S. at page 39, 77 S.Ct. 635.