**BALTIMORE & OHIO RAILROAD COMPANY et al., Plaintiffs-Appellants,**

v.

**UNITED RAILROAD WORKERS DIVISION OF TRANSPORT WORKERS UNION OF AMERICA et al., Defendants-Appellees.**

No. 354, Docket 25757.

United States Court of Appeals Second Circuit.

Argued Aug. 21, 1959.

Decided Oct. 2, 1959.

Rehearing Denied Nov. 12, 1959.

Conboy, Hewitt, O'Brien & Boardman, New York City, for appellants. Joseph P. Allen, F. Sherwood Alexander and Manuel Schultz, New York City, of counsel.

Delson, Levin & Gordon, New York City, for appellees Railroad Marine Union and others.

Donovan, Leisure, Newton & Irvine, New York City, for appellees Bernard Kearns and others.

O'Donnell & Schwartz, New York City, for appellees United Railroad Workers Division of Transport Workers Union of America and others.

Ernest Fleischman, Carl E. Newton and John F. O'Donnell, New York City, of counsel, for appellees.

Before CLARK, Chief Judge, and SWAN and MOORE, Circuit Judges.

SWAN, Circuit Judge.

These are cross-appeals from an order entered June 20, 1959 pursuant to an oral opinion of Judge Bryan. Both parties agree that the dispute between them is one within the scope of the Railway Labor Act, 45 U.S.C.A. § 151 et seq. and the court below so ruled. The case was heard upon affidavits and concessions in colloquy with the court. The facts as stated in Judge Bryan's opinion are substantially as follows:

The appellants are ten interstate railroad corporations each of which has a collective bargaining agreement with

one of the appellee labor organizations (the other appellees being officers and members thereof). Each of the railroad carriers operates in the New York Harbor area one or more diesel powered tugs in the transportation of interstate commerce. The marine operations of appellants are an important factor in the financial success of their business and in the efficiency of the service rendered to the public. Any disruption of such operations would be disastrous not only to them but also to the metropolitan area they serve.

On June 10, 1959 each of the appellants posted a notice, effective at 12:01 a.m. June 15, abolishing the position of oiler on their diesel powered tugs. Previously the engine room of these tugs had been manned by an engineer and an oiler, the latter being sometimes called a fireman, as he is on steam operated tugs. Upon learning of the posting of such notices, appellee United Railroad Workers Division of Transport Workers Union of America, hereafter called T. W. U., by telegram dated 11:55 a.m., June 10, 1959, notified the seven appellants with which T. W. U. had collective bargaining agreements that it considered their action a violation of the agreements and had authorized a strike effective at 12:01 a.m. June 15, 1959.[1] After receipt of the strike threat, these seven appellants on June 11, 1959 made an *ex parte* submission of the dispute created by the threatened strike to the New York Harbor Marine Board of Adjustment as provided for in the applicable collective bargaining agreements. The other three appellants, The Long Island Railroad Company, The Pennsylvania Railroad Company and the Bush Terminal Railroad Company, made a similar *ex parte* submission to the National Railroad Adjustment Board, Fourth Division, Chicago, Illinois, as the collective bargaining agreements applicable to these three appellants did not provide for a special adjustment board. After submission to the appropriate Boards, the appellants

filed the present suit to enjoin the threatened strike. A temporary restraining order was issued by Judge Murphy on the afternoon of June 11, 1959, and the plaintiffs' motion for a preliminary injunction was ordered to be heard on June 16, 1959. On that date the plaintiffs' motion came on before Judge Bryan, together with defendants' cross-motion for a mandatory injunction to restore the oilers to their former positions. Despite the temporary restraining order, a serious work stoppage did occur. The oilers who had been laid off began picketing piers where tug boats were tied up. Employees in other crafts refused to cross the picket lines and all railroad traffic by water in the Harbor area ceased to move. On June 19, 1959 Judge Bryan rendered an oral opinion and by order entered June 20, 1959, granted both plaintiff's motion and defendants' cross-motion, both injunctions to remain in effect until the procedures of the Railway Labor Act, 45 U.S.C.A. § 151 et seq., for settlement of the dispute had been exhausted. Plaintiffs have appealed from that part of the order which directed restoration of the abolished positions. Defendants have appealed from that part of the order which granted a preliminary injunction against a strike or work stoppage, but they explain that their appeal is merely to protect themselves in case the plaintiffs' appeal shall succeed. The order re-established the status which existed before the labor dispute arose and defendants are satisfied with that situation.

The Railway Labor Act as interpreted by numerous cases recognizes two types of disputes between employer and employees, "minor" and "major." The distinction between them is clearly set forth in Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 722–724, 65 S.Ct. 1282, 89 L.Ed. 1886, and was approved recently in Brotherhood of R. R. Trainmen v. Chicago R. & I. R. Co., 353 U.S. 30, 33, 77 S.Ct. 635, 637, 1 L.Ed.2d 622. As there stated, "The first step toward

1. Similar telegrams were subsequently received by the other appellants from the other appellee labor organizations.

settlement of either kind of dispute is negotiation and conference between the parties." Minor disputes arise out of the interpretation or application of existing collective bargaining agreements and grievances arising therefrom, while a major dispute is one that arises from an intended change in agreements affecting rates of pay, rules or working conditions. The Act provides procedures for the settlement of either type in order to prevent the disruption of interstate commerce during its pendency. In the case of a minor dispute the parties are to confer and, if the dispute cannot be settled by conference, either party may resort to the appropriate division of the National Railroad Adjustment Board. 45 U.S.C.A. § 153(i). In a minor dispute the railway employer is under no duty to restore the *status quo ante* during its pendency. In the case of a major dispute there is such a duty, 45 U.S.C.A. § 156, and if the dispute is not adjusted by conference either party may invoke the services of the Mediation Board, or the latter may proffer its services. 45 U.S.C.A. § 155(b).[2]

The appellants have consistently taken the position that as employers they have the managerial right (privilege) which the common law accords to an employer to discontinue an economically unnecessary position, unless the privilege has been lost by statute or by collective bargaining agreements with the unions. They assert that the Act has not curtailed this managerial privilege; that whether it has been lost by their agreements involves an interpretation of those agreements, and consequently the dispute is a minor one within the meaning of the Act. The appellees, on the other hand, contend that the railroads' action in abolishing the position of oiler on diesel powered tugs without prior notice to or discussion with the unions was

a violation both of the collective bargaining agreements and of § 156 of the Act, and consequently the dispute is a major one. Appellees further argue that even if the dispute be considered minor, the railroads had a duty to negotiate under the Railway Labor Act before they unilaterally abolished the position of oiler. The latter argument assumes that the mere posting of the notices of abolition created a dispute. We think the assumption fallacious. No dispute existed until the unions voiced disapproval of the railroads' action. This they did by threatening to strike. They might, however, have acquiesced in the railroads' interpretation of the agreements and not sent a strike threat. Until management announced its decision, the unions had no grievance, and nowhere in the Act is to be found any intimation that management must consult with union representatives before taking such action. The appellees argue that if the railroads were permitted to treat every dispute of this nature as a question of interpretation of the pre-existing agreements, they could thus nullify and emasculate § 156 of the Act by asserting that their action was an exercise of their prerogative of management. The argument is answered to our satisfaction by the analysis of Judge Haynsworth in Norfolk & P. B. L. R. Co. v. Brotherhood of Railroad Trainmen, 4 Cir., 248 F.2d 34, certiorari denied 355 U.S. 914, 78 S.Ct. 343, 2 L.Ed.2d 274, derived from the Cox and Dunlop article in 63 Harvard Law Review 389, 401, which explicitly delineates at pages 41–42 of 248 F.2d the different purposes underlying § 153 and § 156.

"All of such decisions [in the minor dispute category] when effectuated have a resultant effect upon working conditions and are of interest to employees and their representatives. They are none the less

2. By telegram dated June 15, 1959, 6:41 p. m. the National Mediation Board requested appellants and appellees to meet with Mediator O'Connell on June 16 for "discussion and investigation" of issues involved in this dispute. But the National Mediation Board never assumed jurisdiction of the controversy. The discussions were suspended pending disposition of the motions before the district court.

regarded as being within the prerogative of management alone to decide and effectuate in the first instance * * * If a matter falls within the second class of decision [major dispute], under the Railway Labor Act and under the applicable agreements, the carrier can make no change without initiating negotiation by giving the notice required under Section 6 of the Act and participating in the subsequent procedures available in aid of settlement of a 'major dispute.' * * * "

█ Primary jurisdiction to determine whether a dispute is minor or major resides in the agencies established by the Railway Labor Act. As to this the parties are not in disagreement. Appellants acknowledged it implicitly in their *ex parte* submissions to the Adjustment Boards. Appellees expressly acknowledge it in their Brief by the statement: "The role of the Court is to protect the jurisdiction of the Railway Labor Act agencies which are the appropriate bodies to decide the issues herein and to vindicate the policies and procedures of the Railway Labor Act to permit them to be carried out effectively." This view is correct as plainly indicated by Order of Ry. Conductors of America v. Pitney, 326 U.S. 561, at page 567, 66 S.Ct. 322, at page 325, 90 L.Ed. 318, where Mr. Justice Black, speaking for the Court said: "* * * The factual question is intricate and technical. An agency specially competent and specifically designated to deal with it has been created by Congress. Under these circumstances the court should exercise equitable discretion to give that agency the first opportunity to pass on the issue. Certainly the extraordinary relief of an injunction should be withheld, at least, until then. * * * Only after the Adjustment Board acts, but not until then, can

it plainly appear that such relief is necessary to insure compliance with the statute. * * * " 3

The Adjustment Board may decide (1) that the dispute is minor and that the Railroads' interpretation of the collective bargaining agreements is correct; or (2) that the dispute is minor but the Railroads' interpretation of the agreements is incorrect; or (3) that the dispute is major and the Adjustment Board has no jurisdiction. If the Adjustment Board decides that the Railroads' interpretation is correct. it is obvious that the district court has done an injustice to appellants by the mandatory restoration of the oilers to their former positions, for the railroads can never recover the wages they have been forced to pay. If the Adjustment Board decides that the railroads' interpretation is erroneous, the oilers will suffer no injustice for the Board can order restoration and back pay. If the Adjustment Board finds that it lacks jurisdiction because the dispute is major, then resort must be had to the National Mediation Board.

█ Judge Bryan did not decide whether the dispute was minor or major. We think he should have done so. It is clear that the respective contentions of the railroads and the unions are based on existing agreements. Their claims are to rights accrued, not to the creation of new rights for the future. Hence the dispute is a minor one, the resolution of which is committed to the Adjustment Board. Granting a mandatory injunction to restore the oilers to their former positions before the Adjustment Board has had an opportunity to act was erroneous. Missouri-Kansas-Texas R. Co. v. Brotherhood of Locomotive Engineers, 5 Cir., 266 F.2d 335, seems to be precisely in point. There it was held that since the jurisdiction to pass judgment on the merits of the dispute had

3. This language must be understood as applicable only to an injunction intended to maintain the *status quo ante.* It does not apply to an injunction restraining a threatened strike or work stoppage, the prevention of which is necessary

"To avoid any interruption to commerce or to the operation of any carrier engaged therein; * * * " See 45 U.S. C.A. § 151a which sets forth the general purposes of the Act.

been committed to the Adjustment Board, the district court could not, under the guise of exercising its discretionary equity power, require the maintenance of the *status quo ante.* To do so is to decide the merits of the dispute before the Adjustment Board has acted. To similar effect is the decision of this court in Stichman v. General Grievance Committee, 2 Cir., 267 F.2d 941, affirming on opinion below Judge Dawson's decision in Re Hudson & Manhattan R. Co., D.C., 172 F.Supp. 329.

The unions further contend that abolition of the oilers' positions means extra work for the engineers, and that this is contrary to Article 15 of the Joint Agreement.[4] But this question also should be decided by the Adjustment Board before the district court undertakes to decide it—at least when the answer is not perfectly clear.

Judge Bryan thought that the action of the railroads was not "in accordance with the theory or spirit of the Railway Labor Act." [176 F.Supp. 61] The factor that impelled him to preserve the *status quo ante* was undoubtedly his desire to avoid a tie-up of the appellants' marine operations by reason of the picket lines set up by the oilers and the refusal of other employees in related fields to cross the picket lines. However commendable the purpose of granting the mandatory injunction, we find nothing in the Act which authorizes it before the Adjustment Board has acted on the dispute. Accordingly it must be reversed.

Such reversal, however, does not mean that the court was powerless to enjoin the threatened strike. If the unions are to have the benefits of the Act they must also discharge its obligations.

The granting of the preliminary injunction against any strike or work stoppage until the procedures provided by the Act had been exhausted was plainly correct. As pointed out in Brotherhood of R. R. Trainmen v. Chicago R. & I. R. Co., 353 U.S. 30, 39–42, 77 S.Ct. 635, 1 L.Ed. 2d 622, the Norris-LaGuardia Act presents no prohibition of the injunction under the facts appearing in the present case.

CLARK, Chief Judge (dissenting).

In granting the injunction under appeal, which ordered the appellant railroads to reinstate their discharged diesel tug oilers pending resolution of the instant labor dispute by the appropriate statutory agency, Judge Bryan was particularly careful and thorough in supporting his action on grounds stated in a lengthy and reasoned opinion. Therein he set forth his basic conclusions that the precipitous abolition of these jobs by the railroads—with less than five days' effective notice to the unions involved—was in violation of the Railway Labor Act, 45 U.S.C. § 151 et seq., and that temporarily reinstating the oilers was the only sure way to avoid a serious disruption of vital transportation services in the Port of New York. The order of injunction, thus so fully supported, seems to me an eminently sound and proper exercise of judicial power committed to a district judge's discretion. I would affirm the decision below, D.C. S.D.N.Y., 176 F.Supp. 53, in its entirety, and not merely the part directed against the unions, as my brothers hold.

Far too much attention has been directed on this appeal to the question whether the arbitration or the mediation procedures of the Railway Labor Act govern the instant labor dispute.[1] With-

---

4. "Article 15—Classification and Rate Basis

"Established positions shall not be discontinued or abolished and new ones created under different titles covering relatively the same class of work for the purpose of reducing rates of pay and evading the applications of the articles of this Agreement."

1. The designations "minor grievance" (or "dispute") and "major dispute," occasionally used to characterize these respective procedures, though these terms do not appear in the statutes, are particularly inapt here. It cannot be gainsaid that the instant controversy is in many respects of major importance irrespective of which statutory procedure

out question, federal district courts are broadly empowered to issue injunctions and other appropriate orders to carry out the policies and purposes of this Act. Brotherhood of R. R. Trainmen v. Chicago River & Indiana R. Co., 353 U.S. 30, 41–42, 77 S.Ct. 635, 1 L.Ed.2d 622; Virginian Ry. Co. v. System Federation No. 40, Railway Employees Department of American Federation of Labor, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; Railroad Yardmasters of America v. Pennsylvania R. Co., 3 Cir., 224 F.2d 226; see also Brotherhood of R. R. Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283; Graham v. Brotherhood of Locomotive Firemen and Enginemen, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22; Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, Ocean Lodge No. 76, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187; Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173; Cunningham v. Erie R. Co., 2 Cir., 266 F.2d 411. And there is nothing in the statute or in the nature of Adjustment Board proceedings which demands that these powers be radically limited or changed whenever a labor dispute contains an issue cognizable by such a Board.

Nor do I find anything in the two cases particularly relied on by my brothers to require the overturning of these settled legal principles or to furnish definitive support for the unreal and unworkable reading of the Act here made; each rests primarily on its own particular facts governing the exercise of discretion by a court of equity and cannot properly be erected into a general proposition. In order of Ry. Conductors of America v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318, the Court actually reversed a dismissal of an injunction suit to reinstate it, but coupled this reversal with a direction to the trial court to stay action until decision by an Adjustment Board, since it felt that a back pay award for interim wages lost would adequately compensate the employees and avoid irreparable injury. Justice Rutledge in dissenting thought that immediate action was necessary for the workers' protection. In Missouri-Kansas-Texas R. Co. v. Brotherhood of Locomotive Engineers, 5 Cir., 266 F.2d 335, the court vacated an injunction reinstating discharged employees, expressing concern lest the grant of an injunction involve a prejudgment on the merits before action by an Adjustment Board. In that case, as in the Pitney case, immediate action was not required to avoid a major disruption of transportation, and they should be thus differentiated from the present case. And I can see nothing amounting to a prejudgment of the merits by Judge Bryan more than might perhaps be equally argued from a denial of an injunction.[2]

Judge Bryan was clearly correct in holding that the railroads' precipitous action violated their duties under the Railway Labor Act. Sec. 2 of the Act, 45 U.S.C. § 152, applicable to all types of labor disputes, both "major" and "minor," provides:

"First. It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain

is presently applicable to it; indeed, it is but a phase of the dispute as to dispensing with firemen on the dieselization of the railroads which has assumed major importance in this country and Canada. It would seem that these plaintiff railroads have jumped the gun on what may prove to be a nationwide crisis in a few months. See Barden, Railroad Labor Crisis, The Nation, Sept. 12, 1959, p. 128.

**2.** My brothers also cite Norfolk & P. B. L. R. Co. v. Brotherhood of R. R. Trainmen, Lodge No. 514, 4 Cir., 248 F.2d 34, certiorari denied 355 U.S. 914, 78 S.Ct. 343, 2 L.Ed.2d 274, and Stichman v. General Grievance Committee of Brotherhood of Railroad Trainmen, 2 Cir., 267 F.2d 941, affirming In re Hudson & Manhattan R. Co., D.C.S.D.N.Y., 172 F.Supp. 329—cases where the district court had granted an injunction enjoining a strike where after months of negotiation of a minor dispute the union had refused to follow the arbitration procedure. But these cases support that part of the judg-

agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

"Second. All disputes between a carrier or carriers and its or their employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier or carriers and by the employees thereof interested in the dispute."

The instant controversy did not arise from one of the many situations where management may justifiably and in good faith take unilateral action without prior notice to or consultation with the representatives of its employees. Cf. Order of Ry. Conductors of America v. Pitney, supra, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318. Such decisions are not effected with the elaborate legal preparations designed to bring off a *fait accompli* which preceded appellants' abolition of the position of oiler here. It is clear from the objective evidence in the record of appellants' careful planning—one appellant even made application for a temporary restraining order before it had received any communication from defendant unions in regard to the oilers it had discharged—that the management of the railroads well knew their action would evoke most forceful protests and make a work stoppage all but inevitable.

In comparable situations carriers have customarily given substantial advance notice of their intentions and fully negotiated the issues before taking definitive action. See In re Hudson & Manhattan

R. Co., D.C.S.D.N.Y., 172 F.Supp. 329, affirmed on opinion below, Stichman v. General Grievance Committee of Brotherhood of Railroad Trainmen, 2 Cir., 267 F.2d 941; Norfolk & P. B. L. R. Co. v. Brotherhood of R. R. Trainmen, Lodge No. 514, 4 Cir., 248 F.2d 34, certiorari denied 355 U.S. 914, 78 S.Ct. 343, 2 L.Ed. 2d 274; Brotherhood of R. R. Trainmen v. New York Cent. R. Co., 6 Cir., 246 F. 2d 114, certiorari denied 355 U.S. 877, 78 S.Ct. 140, 2 L.Ed.2d 107.[3] There is no reason why this could not have occurred here. Surely on the facts of this case the suggestion that no "dispute" existed and the railroads had no duty to negotiate or otherwise act in good faith until after the unions protested the discharges of the oilers is a strange and wonderful and wholly nullifying reading of the above quoted portions of the Railway Labor Act. These men have permanently lost their livelihood; it is an obvious solecism to require them to make some sort of formal protest before any dispute can become apparent to us.

Finally, the cold hard reality here is, as Judge Bryan found, that only if the oilers are reinstated can a work stoppage and transportation tie-up in the Port of New York be avoided with any certainty, since these displaced workers cannot be enjoined from individual picketing. This fact cannot properly be ignored or deemed irrelevant; it is at the core of the only matter which is the proper concern of this court or the court below. Our sole function here is to further the *public* interest in avoiding a disruption of interstate commerce, not to safeguard the financial position of the railroads or to punish the respondent unions for calling a strike. Only to this limited extent has Congress superseded the general prohibition against federal court interference in railway labor disputes. Virginian Ry. Co. v. System Federation No. 40, Railway Em-

---

ment which I would join my brothers in affirming; they did not involve and do not consider the validity of an order requiring the employers to maintain the status quo during the proceeding.

3. Even in Missouri-Kansas-Texas R. Co. v. Brotherhood of Locomotive Engineers, 5 Cir., 266 F.2d 335, the railroad gave more than two weeks' effective notice to the union.

ployees Department of American Federation of Labor, supra, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789; Order of Ry. Conductors of America v. Pitney, supra, 326 U.S. 561, 566, 66 S.Ct. 322, 90 L.Ed. 318. We should not reverse the sound decision of a conscientious district judge which clearly provides the best possible means of protecting this vital public interest.

On Petition for Rehearing.

PER CURIAM.
Petition denied.

CLARK, Chief Judge (dissenting).

The Supreme Court has now granted certiorari in the case here relied on as controlling precedent, Missouri-Kansas-Texas R. Co. v. Brotherhood of Locomotive Engineers, 5 Cir., 266 F.2d 335, and has accepted as the question for consideration one with direct implications for the issues here. It is thus stated: "Whether a district court under circumstances where a dispute arising under the Railway Labor Act has been submitted by a railroad to the National Railroad Adjustment Board and an injunction against a strike by employees is sought on authority of Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed. 2d 622, may on the granting of an injunction impose reasonable conditions designed to protect the employees against a harmful change in working conditions during pendency of the dispute before the Adjustment Board by ordering that the railroad restore the status quo, or, in the alternative, pay the employees the amount they would have been paid had changes in working conditions giving rise to the dispute not been made." 80 S.Ct. 67. This action, it seems to me, points up the doubtful nature of our decision. Because of the uncertainty thus created and because of the irreparable loss to the employees which our decision will inevitably cause, I believe restudy of the problem is most desirable. I would grant the rehearing.