William C. Hecht, Jr., J.
This motion seeks a temporary-injunction against a threatened strike. Plaintiff Pan American W or Id Airways, Inc. (“Pan American ”), a New Y ork corporation, is an air carrier as defined in the Federal Aviation Act of 1958, as amended (U. S. Code, tit. 49, § 1301 et seq.). It holds certificates of public convenience and necessity pursuant to that Act, under which certificates it operates an air line system for the carriage by air of passengers, property and mail in overseas and foreign commerce. Its routes extend over more than 70,000 miles; its annual revenues are over 300 million dollars; and it claims to transport approximately one third of all overseas air passengers and one fourth of all overseas air and sea passengers, to and from the United States.
Pan American is a “ carrier ” as defined in the Railway Labor Act (U. S. Code, tit. 45, § 181). As such it and its employees and their bargaining agents are subject to all of the provisions affecting railroad labor in sections 151, 152 and 154-163 of that Act (U. S. Code, tit. 45, § 182), as well as the provisions of sections 183-185 affecting air line labor.
Defendant Air Line Pilots Association, International (“ Association ”) is an unincorporated association. It is the duly designated bargaining agent pursuant to title 45 of the United States Code (§ 151, subd. Sixth; § 152) of all domestic employees of Pan American included within the craft of air line pilots (exclusive of supervisory pilots). The individual defendants (“ Pilots ”) are air line pilots who may be scheduled for flight duties on piston aircraft.
The first issue presented is the jurisdiction of this court over the person of defendant Association.
Personal service of the summons and complaint was not made upon Association’s president or treasurer, as required by section 13 of the General Associations Law. It was served on Association’s regional vice-president, who is alleged by plaintiff to be the person in charge of the business in which the Association is engaged here. Pan American contends this service is valid under section 229-b of the Civil Practice Act.
The answer is that Amon v. Moreschi (296 N. Y. 395) unequivocally holds that this section does not apply to unincorporated associations. Substitute service on such a defendant may be effected only by court order, as provided in section 230 of the Civil Practice Act.
Pan American seeks to distinguish that case on the ground that the courts below held that the association was not doing business in the State. The Court of Appeals, however, did not *151 place its decision on any such ground. On the contrary, by answering in the negative the first and ninth questions certified on this appeal, the court explicitly held that 1 ‘ section 229-b of the Civil Practice Act was not intended to have application to actions against unincorporated associations ’ ’ (p. 401).
The motion is therefore denied as to defendant Association, because of lack of jurisdiction over its person.
The summons and complaint and the moving papers were personally served on 125 pilots. The other pilot defendants were not served. Pan American urges, nevertheless, that they may be enjoined because this is a class action, wherein those served may defend for the benefit of all, citing section 195 of the Civil Practice Act and Northwestern Tel. Co. v. Western Union Tel. Co. (197 Misc. 1075).
In the cited case, Walter, J., held that the rights of stockholders of a corporation, inter sese, could be determined in an action where- a representative number were made parties on behalf of all. No case has been cited or found which extends this principle of representation to the drastic remedy of injunctions, with the resultant exposure to contempt. I see no justification for enjoining a person who has been given no notice o-f the proceeding and no opportunity to defend himself, merely because others whose interests may be identical were given such notice and opportunity.
The motion is therefore denied as to all defendant pilots who were not personally served with process within the State, because of lack of jurisdiction over their persons.
The points at issue between Pan American and the 125 defendant pilots who were personally served may be briefly stated.
An agreement (“ the Agreement ”) was signed on February 4, 1959 between Pan American and Association, as the bargaining agent of Pilots. The Agreement was to be in full force and effect at least until August 4, 1960.
The Agreement provides that Pan American shall make every effort to maintain a monthly flight time not to exceed 85 hours, and that a pilot shall not be scheduled in excess of 255 hours during a calendar quarter. A separate memorandum of understanding provides that on jet aircraft, a pilot shall not be scheduled for duty on the flight deck in excess of 8 hours in any 24-hour period.
No such restriction appears in the agreement regarding duty on the flight deck of piston aircraft, the subject matter of this action. Pan American alleges that under past practice the only restriction on the hours of flight deck duty on piston air *152 craft was the regulation of the Federal Aviation Agency, limiting such assignments to 12 hours in every 24-hour period. Pan American alleges further that when the memorandum of understanding was made limiting duty on jet aircraft, Association made similar demands regarding piston aircraft, but withdrew them.
The foregoing allegations are not denied by Pilots. They urge two answering contentions: 1. When the Agreement was executed, the Civil Air Regulations provided that ‘ ‘ two pilots shall remain at the controls at all times while the aircraft is taking off, landing, and while en route, except when the absence of one is necessary in connection with Ids regular duties or when he is replaced by an [authorized] person ” (Code of Fed. Reg., tit. 14, § 41.62).
As Pan American applied these regulations, if the crew consisted of three pilots, the captain was required to be at the controls only at certain periods, and the first officer could be relieved when another fully qualified pilot was assigned by the captain. Further, Pan American’s instructions required that except in emergencies only two qualified pilots be assigned to duty at the controls, thus allowing relief to the third pilot.
After the Agreement was executed, the Civil Air Regulations were amended to require flight crew members to remain at their stations at all times, and to require them to keep their seat belts fastened when at their respective stations. Therefore, Pan American issued new instructions requiring all flight crew members to remain at their respective stations with seat belts fastened throughout the flight, except of course for emergency relief.
The provision that only two qualified pilots need be assigned to duty was deleted, therefore requiring all three pilots to be on duty at all times, again except for necessary relief.
Pan American’s reply to this is that the foregoing represent no changes of substance in flight procedure.
2. Pilots’ second contention is based on the Civil Air Regulation relating to operations outside the continental limits of the United States which provides: ‘1 The pilot in command is in command of the aircraft at all times during flight and is responsible for the safety of persons and goods carried and for the conduct and-safety of members of the crew ” (Code of Fed. Reg., tit. 14, § 41.63). Pilots allege that in good faith they have concluded that flight duty in excess of 8 hours in any 24-hour period under the Pan American’s present requirement is unsafe, particularly in view of substandard conditions at some of the foreign *153 airports. They further contend that nothing in the Agreement may be used as a basis for lifting from the .shoulders of the pilot in command the ultimate and final responsibility for safety in flight. Pilots claim that they have unsuccessfully sought relief on this score from both Pan American and the Federal Aviation Agency. They assert that they have not threatened to strike, but simply notified Pan American that they will not accept work assignments on piston aircraft in excess of 8 hours in any 24-hour period because of this safety problem.
The Agreement sets up a System Board of Adjustment pursuant to section 184 of title 45 of the United States Code, ‘ ‘ for the purpose of adjusting and deciding disputes which may arise under the terms of the [agreement] ”. The Adjustment Board “ shall have jurisdiction over disputes between any employees covered by the [agreement] and [Pan American] growing out of grievances or out of interpretation or application of any of the terms of the [agreement]. The jurisdiction of the Board shall not extend to any proposed changes in hours of employment, rates of compensation, or working conditions covered by existing agreements between the parties hereto ”.
Neither party sought the services of this Adjustment Board. Pan American did invoke services of the National Mediation Board provided for in section 183 of title 45 of the United States Code. That board assigned a file number to the dispute but has as yet taken no action of a mediatory nature.
The complaint seeks an injunction restraining Association and each of the Pilots from ‘1 calling, causing, inducing, conducting or engaging in any strike, refusal to accept work assignments, or work stoppage on piston aircraft by or among Pan American Air Line Pilots ’’until (1) the expiration of the Agreement between Pan American and Association; (2) so long as a dispute involving such Agreement is pending before the National Mediation Board, and for so long thereafter as the commission of such acts constitutes a violation of the Railway Labor Act; (3) “ unless and until the procedures of the Railway Labor Act relative to disputes regarding proposed changes in rules and working conditions have been fully complied with ’ ’. A mandatory injunction is also asked directing defendants to take such steps as shall be necessary to carry the foregoing into effect, including a public rescission by Association of any direction to Pilots to do any of the foregoing acts. Judgment for damages of $250,000 for each day that the strike shall continue, is also asked.
*154 This motion seeks the same relief, pendente lite. Pilots’ refusal to accept work assignments on piston aircraft in excess of 8 hours in any 24-hour period was stated to become effective on April 4. However, at the argument of the motion, they agreed to refrain from taking any action pending this determination.
No relief can be granted against Association, nor against Pilot defendants who were not personally served, because of lack of jurisdiction over their persons. Neither may the court prohibit Pilots, directly or indirectly, whether singly or in concert, from ceasing or refusing to perform any work or to remain in any relation of employment. (Civ. Prac. Act, § 876-a, subd. 1, par. [f], cl. [1]; Opera On Tour v. Weber, 285 N. Y. 348, 353.)
The concerted action by Pilots in refusing to accept work assignments in excess of 8 hours is a strike, whatever reason they may assign therefor. The Civil Practice Act (§ 876-a) precludes granting any relief here, because the papers do not justify any finding ‘ ‘ That unlawful acts have or a breach of any contract not contrary to public policy has been threatened or committed” (subd. 1, par. [a]).
Pan American asserts that section 876-a is inapplicable here because this is not a1 ‘ labor dispute ’ ’. It clearly is that, because the dispute is about hours of employment, and subdivision 10, paragraph (c), specifically provides that “The term ‘ labor dispute ’ includes any controversy concerning terms or conditions of employment.” This dispute is therefore altogether different from seeking to prevent an employer from substituting “ canned music ” for live musicians (Opera On Tour v. Weber, supra, pp. 355, 357), or from using his tug for more than 8 hours a day (Dalzell Towing Co. v. United Marine Div., I. L. A., 279 App. Div. 212, 215 [1st Dept.]).
Pan American cites cases of conceded labor disputes where strikes have been enjoined because they involved a breach of contract not contrary to public policy. Those were cases where one union sought to coerce an employer to breach a valid collective bargaining agreement with another union (Florsheim Shoe Store Co. v. Retail Shoe Salesmen Union, 288 N. Y. 188; Metzger Co. v. Fay, 4 A D 2d 436 [1st Dept.]; Gulf Oil Corp. v. Smallman, 270 App. Div. 129 [2d Dept.]). Those cases have no application here, where the dispute is between the parties to the contract in regard to the terms of the contract.
Pan American argues that the strike is a breach of a “no strike ” provision in the contract. There is no such provision in the Agreement. Pan American urges that such a provision may be implied from the fact that the contract has a fixed term. *155 It cites some authorities (none from this State) that damages may be awarded for strikes where such contracts are in effect.
Whether or not those authorities would be followed on that issue, it is clear that a strike under such a contract may not be enjoined. In situations other than labor disputes, the existence of an express no-strike clause in the contract may furnish a basis for injunctive relief. (See Dalzell Towing Co. v. United Marine Div., I. L. A., supra, Record on Appeal, fols. 13-15.)
But where a labor dispute exists, even an express no-strike provision in the contract will not justify an injunction. This has been the interpretation by the Federal courts of the Norris-La Guardia Act (U. S. Code, tit. 29, §§ 101-115), upon which our section 876-a of the Civil Practice Act is patterned. This was aptly expressed by Chief Judge Clabk, speaking for the Court of Appeals in the Second Circuit, in a case strikingly similar to the one at bar. In Bull S. S. Co. v. Seafarers’ Int. Union (250 F. 2d 326) he said (pp. 327-328): “ The parties entered into a collective bargaining agreement effective October 15, 1956, which runs until September 30, 1958. The agreement provides in part that ‘ [t]here shall be no strikes, lockouts or stoppages of work ’ while its provisions are in effect. On June 17, 1957, the Union sought to renegotiate certain wages. These negotiations were unsuccessful and on August 19, 1957, the Union called a strike which still continued when the trial court issued its order * * * But the basic controversy concerns wages — terms or conditions of employment — and thus, under § 13(c), this is a labor dispute. Nothing in the Act makes its provisions inapplicable where, after a labor dispute arises, one party takes action which constitutes a breach of a contract between them. It is immaterial that the strike might be a breach of the Union’s duty under the collective bargaining agreement or that the controversy itself might be determined by reference to it ”. (Italics supplied.)
Pan American’s final argument is that the strike is illegal, and therefore not protected by section 876-a, because it is in violation of the Railway Labor Act. I find no such violation. On the contrary, it appears that Pan American has not exhausted its remedies under that Act and that if it invoked the proper remedy it could obtain injunctive relief from the Federal court, which is the proper forum for such relief. This is an independent ground for denying the injunction, irrespective of section 876-a of the Civil Practice Act.
The general purposes of the Railway Labor Act are: “ (1) To avoid any interruption to commerce or to the operation of any *156 carrier engaged therein; * * * (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules or working conditions; (5) to provide for the prompt and orderly settlement of disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions”. (U. S. Code, tit. 45, § 151-a.)
The disputes described in subdivision (4) are called “ major disputes”. “They arise * * * where it is sought to change the terms of [a collective agreement] and therefore the issue is not whether an existing agreement controls the controversy ’ ’ (Elgin, Joliet & Eastern Ry. Co. v. Burley, 325 U. S. 711, 723).
The disputes described in subdivision (5) are called “minor disputes ”. “ The dispute relates either to the meaning or proper application of a particular provision that relates to a specific situation or to an omitted case ” (supra, p. 723).
The procedure in regard to both types of disputes starts with negotiation between the parties. Minor disputes may be referred by either party to the appropriate adjustment board — in this case the System Adjustment Board provided in the agreement (U. S. Code, tit. 45, § 184). Any award of such board “ shall be final and binding upon both parties to the dispute ”. In other words, this is a forum of compulsory arbitration (Brotherhood of R. R. Trainmen v. Chicago Riv. & Indiana R. R. Co., 353 U. S. 30, 40).
“ Major disputes ”, as well as any other disputes not referrable to an adjustment bo'ard, are within the jurisdiction of the National Mediation Board (U. S. Code, tit. 45, § 183). If mediation fails, the board shall try to induce the parties to submit the controversy to arbitration. If the arbitration is not accepted by both parties, for 30 days thereafter ‘ ‘ no change shall be made in the rates of pay, rules or working conditions or established practices in effect prior to the time the dispute arose ” (U. S. Code, tit. 45, § 155, subd. First, par. [b]). The President may then, if the mediation board so recommends, appoint an emergency board to investigate and report; for 30 days after this report, “ no change except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose ” (§ 160).
Pan American has elected to treat this controversy as a major dispute, and has invoked the services of the mediation board. But the Norris-La Guardia Act is an insuperable bar to an injunction, pendente lite, in such a dispute. (Telegraphers v. Chicago & Northwestern Ry. Co., 362 U. S. 330.)
*157 The railroad there had applied to various State utility commissions for permission to consolidate numerous stations. This would have resulted in disemploying the agents at those stations.
The union served a notice, pursuant to section 156 of title 45 of the United States Code, that it wanted to negotiate with the railroad to amend the current bargaining agreement by adding a rule that no position then in existence would be abolished or discontinued except by agreement between the railroad and the union. The latter invoked the services of the National Mediation Board. The railroad offered to transfer the affected agents to productive jobs, or to limit the number of jobs abolished to an agreed number per year, or to pay supplemental unemployment benefits to the affected employees. The railroad, however, claimed the right to close the stations without the union’s consent as a privilege of management.
The union offered only the alternative of compliance with the proposed rule or a .strike. The Court of Appeals in the Seventh Circuit granted a permanent injunction, saying: “We, therefore, hold that such a demand as here made by the Union is completely outside the ambit of ‘ rates of pay, rules or working conditions ’, as those words are used in the Railway Labor Act * * * and hence is not within the scope of mandatory bargaining. Therefore, the terms of the Norris-LaGuardia Act are here inapplicable ” (Chicago & Northwestern Ry. Co. v. Order of Rail. Tel., 264 F. 254, 260).
The Supreme Court reversed. It held this to be a “ major ” rather than a “ minor ” dispute (362 U. S. 330, 341). The majority said, per Black, J. (pp. 338-339): “ The railroad has argued throughout the proceedings that the union’s strike here may be enjoined, regardless of Norris-LaGuardia, because its effort to bargain about the consolidation and abandonment of railroad stations is unlawful. * * * Here, far from violating the Railway Labor Act, the union’s effort to negotiate its controversy with the railroad was in obedience to the Act’s command that employees as well as railroads exert every reasonable effort to settle all disputes ‘ concerning rates of pay, rules, and working conditions.’ 45 U. S. C. § 2, First.”
The railroad there urged the same argument as Pan American does here, that permitting the strike to take place would run counter to the national interest in fostering an efficient transportation system. The court said (p. 342): “In concluding that the injunction ordered by the Court of Appeals is forbidden by the Norris-LaGuardia Act, we have taken due account of the railroad’s argument that the operation of unnecessary stations, services and lines is wasteful and thus runs counter to the con *158 gressional policy, expressed in the Interstate Commerce Act, to foster an efficient national railroad system. * * * It may be, as some people think, that Congress was unwise in curtailing the jurisdiction of federal courts in railroad disputes as it did in the Norris-LaGuardia Act. * * * These arguments, however, are addressed to the wrong forum. If the scope of the Norris-LaGuardia Act is to be cut down in order to prevent ‘ waste ’ by the railroads, Congress should be the body to do so. Such action is beyond the judicial province and we decline to take it.”
Since section 876-a of the Civil Practice Act was patterned after the Norris-La Guardia Act, and is substantially similar in its language, the same conclusion must follow here.
Neither party has seen fit to submit this controversy to the Adjustment Board. In the event of such a submission, a Federal court may issue an injunction pendente lite against a strike, despite the Norris-La Guardia Act, because “ there must be an accommodation of that statute and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved ’ ’ (Trainmen v. Chicago Riv. & Indiana R. R. Co., 353 U. S. 30, 40). Such injunctions were sustained in Missouri-Kansas-Texas R. R. Co. v. Brotherhood of Locomotive Engineers (266 F. 2d 335 [C. A. 5th], cert. granted on another issue 361 U. S. 810; Baltimore & Ohio R. R. Co. v. United Railroad Workers, 271 F. 2d. 87 [C. A. 2d]; Matter of Hudson & Manhattan R. R. Co., 172 F. Supp. 329, affd. “ on Judge Dawson’s lucid and well reasoned opinion below ”, sub. nom. Stichman v. General Grievance Committee of Brotherhood of R. R. Trainmen, 267 F. 2d 941, 942 (C. A. 2d); Norfolk & Portsmouth Belt Line R. R. Co. v. Brotherhood of R. R. Trainmen, 248 F. 2d 34 [C. A. 4th], cert. denied 355 U. S. 914).
Pan American argues that the Agreement clearly requires Pilots to work on piston aircraft up to a maximum of 12 hours in any 24-hour period; and that since Pilots refuse to work more than 8 hours, they are seeking to change the terms of the Agreement. This, it is claimed, constitutes a major dispute, and for that reason Pan American has sought the services of the Mediation Board. If Pan American is correct in its characterization of the dispute, injunctive relief may not .be granted (Telegraphers v. Chicago & Northwestern Ry. Co., supra; see, also, Trainmen v. Toledo, Peoria & Western R. R. Co., 321 U. S. 50).
However, I do not agree with Pan American’s contention that the terms of the Agreement are so clear that I may find as a *159 matter of law that this is not a minor dispute, which the Board of Adjustment should handle in the first instance. That board is simply a board of arbitration, and the general principle applies that the resolution of a contract dispute may be removed from the arbitrators only 11 if there is no real ground of claim ’ ’ (cf. Matter of General Elec. Co. [Elec. Radio & Mach. Workers], 300 N. Y. 262, 264, with Matter of Potoker [Brooklyn Eagle] 2 N Y 2d 553, 559-560).
A court should be particularly reluctant to make such a determination in an intricate and technical factual question whose resolution was delegated by Congress to a trained administrative body. As was said by Judge Swan in Baltimore & Ohio R. R. Co. v. United R. R. Workers (271 F. 2d 87, 91 [C. A. 2d]): ‘1 Primary jurisdiction to determine whether a dispute is minor or major resides in the agencies established by the Railway Labor Act. * * * This view is correct as plainly indicated by Order of Ry. Conductors of America v. Pitney, 326 U. S. 561, at page 567 * * where Mr. Justice Black, speaking for the Court said: ‘ * * * The factual question is intricate and technical. An agency specially competent and specifically designated to deal with it has been created by Congress. Under these circumstances the court should exercise equitable discretion to give that agency the first opportunity to pass on the issue. Certainly the extraordinary relief of an injunction should be withheld, at least, until then. * * * Only after the Adjustment Board acts, but not until then, can it plainly appear that such relief is necessary to insure compliance with the statute. * * * ’
“ The Adjustment Board may decide (1) that the dispute is minor and that the Railroads’ interpretation of the collective bargaining agreements is correct; or (2) that the dispute is minor but the Railroads’ interpretation of the agreements is incorrect; or (3) that the dispute is major and the Adjustment Board has no jurisdiction. * * * If the Adjustment Board finds that it lacks jurisdiction because the dispute is major, then resort must be had to the National Mediation Board.”
That applies with special force to the nature of the dispute here.
It must be noted at the outset that the Agreement is silent as to the daily hours of duty on piston aircraft, though it prescribes monthly and quarterly maximum for all aircraft. Pan American contends that past practice was to require 12 hours of duty; that the Pilots sought to restrict this to 8 hours on all aircraft; that the matter was finally compromised by Pan American’s *160 agreement to that maximum on jet aircraft and by Pilots’ withdrawal of the demand in respect to piston aircraft. That issue, as to the circumstances surrounding execution of the Agreement and the consequent interpretation thereof, is for the Adjustment Board.
More important, Pan American contends that, in the absence of any maximum in the Agreement, the only applicable maximum is that imposed by the regulations of the Federal Aviation Agency — that is, 12 hours. Pilots contend that an integral condition of those regulations, namely, the period during duty time when the Pilots must be at their stations with seat belts fastened, was changed in a significant maimer during the life of the contract. Whether this change affects the obligation of the Pilots to be on duty for the samp 12 hours is likewise a question of interpretation for the Adjustment Board.
Furthermore, there is the issue of safety. I am not impressed with Pilots’ argument that their responsibility for safety justifies each pilot in determining unilaterally that he will not abide by a contractual duty, if the Agreement does require 12 hours, except, of course, in special circumstances where he concludes that the flight would be unsafe. But if it is contended that 12 hours of duty does create a safety hazard, that is something which the Board of Adjustment might wish to determine in the public interest, regardless of the Agreement.
Apposite here is the language of Missouri-Kansas-Texas R. R. Co. v. Brotherhood of Locomotive Engineers (266 F. 2d 335 [C. A. 5th], supra). There the shoe was on the other foot. The railroad made certain changes in the intradivisional runs on freight trains, and the away from home terminals for freight service. The brotherhood claimed that this was a major dispute, because it involved changes in agreements affecting rate of pay, rules or working conditions. The railroad claimed it was a minor dispute, and invoked the services of the Adjustment Board.
In affirming a preliminary injunction granted by the District Court, pending determination of the controversy by the Adjustment Board, the court said (p. 340): “Without intimating any view as to their validity, we think it clear that the respective contentions of the Railroad Companies and of the employees are based upon existing agreements; their claims are to rights accrued and not to have new rights created for the future. The dispute is thus a ‘ minor ’ dispute, the resolution of which is committed to the National Railroad Adjustment Board. Primary jurisdiction of that Board cannot be defeated by the emphasis *161 with which any party asserts that its position is clearly the only rightful one, nor would it be appropriate for this Court to discuss the relative merits of questions which must be decided by that Board” (italics in original).
Finally, if Ban American should invoke the jurisdiction of the System Adjustment Board, any application for injunction pending adjudication by that board should be made in the Federal court, rather than here. The Federal court undoubtedly has jurisdiction to grant such relief, even if there is no diversity of citizenship. (See dissenting opinion of Mr. Justice Stewart in Telegraphers v. Chicago & Northwestern Ry. Co., 362 U. S. 330, 364, supra; Brotherhood of R. R. Trainmen v. New York Central R. R. Co., 246 F. 2d 114, 119-121 [C. A. 6th]; dissenting opinion of Justice Stewart, supra, p. 122.)
I have serious doubts as to the State court’s power to grant an injunction under such circumstances (Bogle v. Jakes Foundry Co., 362 U. S. 401, revg. Jakes Foundry Co. v. Tennessee-Carolina Transp., 329 S. W. 2d 364, 365).
There the Tennessee Court of Appeals had granted a preliminary injunction and other relief. The injunction required members of the Teamsters Union to continue rendering common carrier service at a shipper’s plant, which service they had stopped because of picketing at the plant. The union members had questioned the jurisdiction of the State court “upon the ground that it involved a labor dispute which had been preempted from state control by federal power because it involved activity either protected by section 7 or prohibited by section 8(b) of the Taft-Hartley Act (29 U. S. C. A. §§ 157, 158(b)).” The Tennessee Supreme Court denied certiorari. The union members then petitioned the United States Supreme Court for certiorari. Their petition alleged that since they were beneficiaries of a collective bargaining agreement permitting them to respect picket lines, a refusal to cross another picket line maintained in support of a lawful strike came within the protection of the provision in subdivision (b) of section 8 of the Taft-Hartley Act. Therefore the State court had no jurisdiction to enjoin such conduct on the sole ground that a refusal to cross such picket line interferes with duties imposed by State law on common carriers to serve all customers without discrimination.
The United States Supreme Court granted the petition for certiorari, insofar as it awards a permanent injunction, and to that extent the judgment was reversed. The court cited Teamsters Union v. Kerrigan Iron Works (353 U. S. 968) and *162 San Diego Unions v. Garmon (359 U. S. 236). The former had summarily reversed a similar decision of the Tennessee Court of Appeals.
The latter decision is thus summarized in the Official Reporter’s headnote: “Although the . National Labor Relations Board had declined to exercise jurisdiction, a California state court was precluded by the National Labor Relations Act from awarding damages to respondents under state law for economic injuries resulting from the peaceful picketing of their plant by labor unions which had not been selected by a majority of respondents’ employees as their bargaining agents.”
In Goodwins, Inc. v. Hagedorn (303 N. Y. 300) defendant union sought to force the employer to recognize it as sole collective bargaining agent, despite the claim of a rival union which had already instituted an appropriate representation proceeding before the National Labor Relations Board.
The majority voted to enjoin the picketing. They concluded that the State court had jurisdiction because defendant’s activities did not fall within any of the categories of union unfair labor practices denominated in the Taft-Hartley Act. Three Judges dissented, on the ground that the State court had no jurisdiction over the subject matter. “In the case before us, the union activity complained of — even assuming that it is not the precise conduct denominated an unfair labor practice by the Labor Management Relations Act of 1947 (the TaftHartley Act) — is so closely related to the activities proscribed by that statute' * * * that it must be regarded as within that 1 peripheral area * * * into which the states may not intrude without Federal authorization. ’ * * * once it appears that Congress has pre-empted certain conduct in the field of unfair labor practices, state tribunals have no jurisdiction and ‘ state laws have no application ’.” (Dissenting opinion of Judge Ftjld, pp. 310-311.)
From the foregoing I think it is clear that the Court of Appeals would hold that this court has no jurisdiction in a field which Congress has pre-empted by the Railway Labor Act. It may enjoin conduct in violation of the Federal agency’s determination after that agency has acted, but not before then (Stewart Stamping Corp. v. Uprichard, 284 App. Div. 902 [2d Dept.]; Manion v. Kansas City Term. Ry. Co., 353 U. S. 927).
The motion for an injunction pendente lite is therefore denied in all respects. Settle order.